# BENDER ET AL. *v.* WILLIAMSPORT AREA SCHOOL DISTRICT ET AL.

No. 84–773.   Argued October 15, 1985—Decided March 25, 1986

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined. MARSHALL, J., filed a concurring opinion, *post*, p. 549. BURGER, C. J., filed a dissenting opinion, in which WHITE and REHNQUIST, JJ., joined, *post*, p. 551. POWELL, J., filed a dissenting opinion, *post*, p. 555.

*James M. Smart, Jr.*, argued the cause for petitioners. With him on the briefs were *Samuel Eric Hans Ericsson, Lynn Robert Buzzard, Kimberlee Wood Colby, Curran Tiffany, Gerald W. Seevers*, and *Michael Joseph Woodruff.*

*Deputy Solicitor General Fried* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Acting Assistant Attorney General Willard, Michael W. McConnell, Anthony J. Steinmeyer*, and *Robert V. Zener.*

*John C. Youngman, Jr., pro se*, argued the cause for respondents and filed a brief for himself.*

---

*Briefs of *amici curiae* urging reversal were filed for the Ad Hoc Group of State Education Officials, School Administrators, and School Board Members by *William H. Ellis;* for the Catholic League for Religious and Civil Rights by *Steven Frederick McDowell;* for the Concerned Women for American Education and Legal Defense Foundation by *Michael P. Farris* and *Jordan W. Lorence;* for the Inter-Varsity Christian Fellowship of the U. S. A. by *George R. Grange II;* and for the United States Catholic Conference by *Wilfred R. Caron* and *Mark E. Chopko.*

Briefs of *amici curiae* urging affirmance were filed for the American Association of School Administrators by *David S. Tatel* and *Elliot M. Mincberg;* for the American Civil Liberties Union et al. by *Jack D. Novik, Charles S. Sims, Burt Neuborne, Stefan Presser*, and *Joy L. Koletsky;* for

JUSTICE STEVENS delivered the opinion of the Court.

This case raises an important question of federal appellate jurisdiction that was not considered by the Court of Appeals: Whether one member of a School Board has standing to appeal from a declaratory judgment against the Board. We conclude that although the School Board itself had a sufficient stake in the outcome of the litigation to appeal, an individual Board member cannot invoke the Board's interest in the case to confer standing upon himself.

## I

In September 1981 a group of high school students in Williamsport, Pennsylvania, formed a club called "Petros" for the purpose of promoting "spiritual growth and positive attitudes in the lives of its members." App. 46. The group asked the Principal of the high school for permission to meet on school premises during student activity periods scheduled during the regular schoolday on Tuesdays and Thursdays. The Principal allowed Petros to hold an organizational meeting that was attended by approximately 45 students. At that meeting passages of scripture were read and some students prayed. There is no evidence that any students, or parents, expressed any opposition or concern about future meetings of Petros. The Principal nevertheless advised the group that they could not hold any further meetings until he had discussed the matter with the School Superintendent.

the American Jewish Committee et al. by *Samuel Rabinove, Richard T. Foltin, William B. Duffy, Jr.,* and *William S. Ellis;* for the American Jewish Congress et al. by *Robert Reinstein, Jeffrey I. Pasek, Theodore R. Mann,* and *Nathan Z. Dershowitz;* and for the Anti-Defamation League of B'nai B'rith et al. by *Ruti G. Teitel, Justin J. Finger, Meyer Eisenberg, Jeffrey P. Sinensky,* and *Steven M. Freeman.*

Briefs of *amici curiae* were filed for the Baptist Joint Committtee on Public Affairs et al. by *Donald R. Brewer;* for Kiwanis International et al. by *Stanley C. Fickle;* and for the Rutherford Institute et al. by *Larry L. Crain, Guy O. Farley, Jr., John W. Whitehead, James J. Knicely, Thomas S. Neuberger, Thomas O. Kotouc,* and *William B. Hollberg.*

The Superintendent, in turn, advised the students that he would respond to their written request for recognition after he received "competent legal advice [from the School District's Solicitor] as to the propriety of approving establishment of the proposed prayer club" on school premises. *Id.*, at 42.

On November 16, 1981, the Principal and the Superintendent met with representatives of Petros and advised them that "based on the Solicitor's legal opinion, their request must be denied." 563 F. Supp. 697, 701 (MD Pa. 1983). The legal opinion is not a part of the record; nor does the record contain any evidence that the Principal, the Superintendent, or any other person except the Solicitor had voiced any opposition to the proposed meetings by Petros. Indeed, Petros was informed that it could meet off school premises and "would be given released time during the activity period" if it could secure "a location and an adult supervisor, preferably a clergyman" for their meetings. *Ibid.*

The students thereafter wrote a letter to the Chairman of the Williamsport Area School Board appealing the Superintendent's decision. At a meeting held January 19, 1982, the Board upheld the Superintendent's decision and "denied the appeal on the basis of the Solicitor's opinion." *Ibid.* (citations omitted).

## II

On June 2, 1982, 10 of the students filed suit in the United States District Court against the Williamsport Area School District, the 9 members of the School Board, the Superintendent of the District, and the Principal of the high school. Although there is a general allegation in the first paragraph of the complaint that the action was brought against the defendants "in their individual and official capacities," App. 13, the specific allegation concerning each of the named members of the Board was in this form: "John C. Youngman, Jr., is a member of the Williamsport Area School Board and is sued in that capacity," *id.*, at 16. The complaint alleged that the

defendants' refusal to recognize Petros and to allow it to meet on the same basis as other student groups because of its religious activities violated the First Amendment. The complaint prayed for declaratory and injunctive relief.

One answer was filed on behalf of all the defendants. Although they admitted most of the material allegations of the complaint, they alleged that they had "requested and received in writing an opinion from the school district solicitor and legal counsel that it would be unlawful, improper and unconstitutional to recognize said group as a student organization." *Id.*, at 33.

After plaintiffs completed their discovery (defendants took no depositions), the parties filed cross-motions for summary judgment supported by affidavits, the deposition testimony, and statements of material fact not in dispute. On November 9, 1982, the District Court entered an order finding that the record was incomplete. It thereupon directed the parties to submit affidavits or other documentation concerning "the exact nature of the activity period, the type of activities or clubs that have been, and would be, approved, and what proposed groups, if any, have been denied approval." *Id.*, at 101. After that additional information was supplied, and after the case had been fully briefed, the District Court on May 12, 1983, filed a detailed and carefully written opinion in which it stated:

> "Presently before the court are the parties' cross-motions for summary judgment. . . . Although the case presents only a question of law, this is not to say that the facts are unimportant. On the contrary, the undisputed facts are of paramount importance to the resolution of the legal question presented in this case. A slight change in the facts could very well have dictated a contrary decision.
>
> "After carefully reviewing those facts, and after giving full consideration to all pertinent legal authority,

the court concludes that because the defendant school district is not constitutionally required to deny the plaintiffs the opportunity to meet, by doing so solely on constitutional grounds it has impermissibly burdened their free-speech rights. Accordingly, summary judgment will be granted in favor of the plaintiffs." 563 F. Supp., at 699–700.

The final order entered by the District Court was a ruling "in favor of the plaintiffs and against the defendants on plaintiffs' freedom of speech claim."[1] No injunction was entered, and no relief was granted against any defendant in his individual capacity. The District Court, in effect, merely held that the Board's attorney was incorrect in his legal advice.

The School District did not challenge the judgment of the District Court in any way. It made no motion for a stay and took no appeal. Instead, it decided to comply with the judgment and to allow Petros to conduct the meetings it had requested.

However, John C. Youngman, Jr., who was then still a member of the Board, did file a timely notice of appeal.[2]

### III

In the Court of Appeals no one raised any question about Mr. Youngman's standing to appeal. The court did note that all of the original plaintiffs had graduated from high school, but it granted a motion to add additional plaintiffs who were

---

[1] The full text of the court's order read as follows:

"NOW, this 12th day of May, 1983, in accordance with the reasoning set forth in the accompanying Opinion, it is hereby ordered that:

"(1) Summary judgment is granted in favor of the defendants and against the plaintiffs on plaintiffs' free exercise claim;

"(2) Summary judgment is granted in favor of the plaintiffs and against the defendants on plaintiffs' freedom of speech claim; and,

"(3) The Clerk of the Court shall close this case." App. to Pet. for Cert. 105a.

[2] We are advised that his term of office expired while the case was pending before the Court of Appeals.

currently enrolled students in order to prevent the case from becoming moot. 741 F. 2d 538, 542, n. 4 (CA3 1984). Neither the majority nor the dissenting opinion even mentioned Mr. Youngman.

After repeatedly stressing "the crucial role which the particular facts play in every first amendment analysis," *id.*, at 541–542,[3] the majority of the Court of Appeals held "that the particular circumstances disclosed by this record and present at the Williamsport Area High School lead to the inexorable conclusion that the constitutional balance of interests tilts against permitting the Petros activity to be conducted within the school as a general activity program," *id.*, at 561.

In dissent, Judge Adams suggested that the majority had implicitly adopted a *per se* rule because of its concern about "the possibility of unconstitutional extensions of the Williamsport arrangement elsewhere," instead of performing the "more difficult adjudicative task [of carefully sifting the facts] on a case-by-case basis." *Id.*, at 569.

The importance of the question presented by the students' petition for certiorari persuaded us that the case merited plenary review. 469 U. S. 1206 (1985). After granting certiorari, however, we noticed that neither the Board nor any of the defendants except Mr. Youngman opposed the students' position and that only Mr. Youngman had challenged the District Court's judgment by invoking the jurisdiction of the Court of Appeals. We therefore find it necessary to answer the question whether Mr. Youngman had a sufficient

---

[3] In this regard, consider also the Court of Appeals' emphasis on "the specific facts of the case," 741 F. 2d, at 559 (emphasis deleted); its statement that the "facts of this case concededly present a close question," *ibid.;* its reference to "the unique situation presented here," *id.*, at 559, n. 28; and the following statement:

"Because each additional fact and factor impacts so heavily upon a school prayer analysis in a determination as to whether the particular circumstances pass constitutional muster, we feel it necessary to be precise in considering the relevant facts leading to a particular conclusion." *Id.*, at 560, n. 30.

stake in the outcome of the litigation to support appellate jurisdiction. The parties and the *amici* have identified three different capacities in which Mr. Youngman may have had standing to appeal—as an individual, as a member of the Board, and as a parent.

## IV

Before considering each of the standing theories, it is appropriate to restate certain basic principles that limit the power of every federal court. Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto. See, *e. g.*, *Marbury* v. *Madison*, 1 Cranch 137, 173–180 (1803). For that reason, every federal appellate court has a special obligation to "satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review," even though the parties are prepared to concede it. *Mitchell* v. *Maurer*, 293 U. S. 237, 244 (1934). See *Juidice* v. *Vail*, 430 U. S. 327, 331–332 (1977) (standing). "And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it. [When the lower federal court] lack[s] jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit." *United States* v. *Corrick*, 298 U. S. 435, 440 (1936) (footnotes omitted).[4]

This obligation to notice defects in a court of appeals' subject-matter jurisdiction assumes a special importance

---

[4] See also, *e. g.*, *Sumner* v. *Mata*, 449 U. S. 539, 547–548, n. 2 (1981); *City of Kenosha* v. *Bruno*, 412 U. S. 507, 511 (1973); *Clark* v. *Paul Gray, Inc.*, 306 U. S. 583, 588 (1939); *St. Paul Mercury Indemnity Co.* v. *Red Cab Co.*, 303 U. S. 283, 287–288, n. 10 (1938); *Stratton* v. *St. Louis Southwestern R. Co.*, 282 U. S. 10, 13 (1930); *Louisville & Nashville R. Co.* v. *Mottley*, 211 U. S. 149, 152 (1908) (citing cases); *Cameron* v. *Hodges*, 127 U. S. 322, 325 (1888). Cf. *Capron* v. *Van Noorden*, 2 Cranch 126, 127 (1804).

when a constitutional question is presented. In such cases
we have strictly adhered to the standing requirements to en-
sure that our deliberations will have the benefit of adversary
presentation and a full development of the relevant facts.[5]
Thus, as we emphasized in *Valley Forge Christian College* v.
*Americans United for Separation of Church and State, Inc.*,
454 U. S. 464, 472 (1982):

> "[A]t an irreducible minimum, Art. III requires the
> party who invokes the court's authority to 'show that he
> personally has suffered some actual or threatened injury
> as a result of the putatively illegal conduct of the de-
> fendant,' *Gladstone, Realtors* v. *Village of Bellwood*,
> 441 U. S. 91, 99 (1979), and that the injury 'fairly can
> be traced to the challenged action' and 'is likely to be
> redressed by a favorable decision,' *Simon* v. *Eastern
> Kentucky Welfare Rights Org.*, 426 U. S. 26, 38, 41
> (1976). . . .
>
> "The requirement of 'actual injury redressable by the
> court,' *Simon, supra*, at 39, serves several of the 'im-
> plicit policies embodied in Article III,' *Flast* [v. *Cohen*,
> 392 U. S. 83,] 96 [(1968)]. It tends to assure that the
> legal questions presented to the court will be resolved,
> not in the rarified atmosphere of a debating society, but
> in a concrete factual context conducive to a realistic
> appreciation of the consequences of judicial action. The
> 'standing' requirement serves other purposes. Because
> it assures an actual factual setting in which the litigant
> asserts a claim of injury in fact, a court may decide the

---

[5] We have frequently recognized the importance of the facts and the
factfinding process in constitutional adjudication. See, *e. g.*, *Minnick* v.
*California Dept. of Corrections*, 452 U. S. 105, 120–127 (1981); *England* v.
*Louisiana Board of Medical Examiners*, 375 U. S. 411, 416 (1964) ("How
the facts are found will often dictate the decision of federal claims");
*Townsend* v. *Sain*, 372 U. S. 293, 312 (1963) ("It is the typical, not the
rare, case in which constitutional claims turn upon the resolution of con-
tested factual issues"). Cf. *supra*, at 538–540, and n. 3.

case with some confidence that its decision will not pave the way for lawsuits which have some, but not all, of the facts of the case actually decided by the court."

V

The first paragraph of the complaint alleged that the action was brought against the defendants "in their individual and official capacities." App. 13. There is, however, nothing else in the complaint, or in the record on which the District Court's judgment was based, to support the suggestion that relief was sought against any School Board member in his or her *individual* capacity. Certainly the District Court's judgment granted no such relief. See n. 1, *supra*. Accordingly, to paraphrase our holding in *Brandon* v. *Holt*, 469 U. S. 464, 469 (1985), "[t]he course of proceedings . . . make it abundantly clear that the action against [Mr. Youngman] was in his official capacity and only in that capacity." See *Kentucky* v. *Graham*, 473 U. S. 159, 167, n. 14 (1985). Since the judgment against Mr. Youngman was not in his individual capacity, he had no standing to appeal in that capacity.[6]

VI

As a member of the School Board sued in his official capacity Mr. Youngman has no personal stake in the outcome of

---

[6] The fact that Mr. Youngman was sued in his official capacity does not give him standing to appeal in his individual capacity. Acts performed by the same person in two different capacities "are generally treated as the transactions of two different legal personages." F. James & G. Hazard, Civil Procedure § 11.6, p. 594 (3d ed. 1985).

The fact that Mr. Youngman is named in a petition for attorney's fees that was filed in the District Court after the appeal was taken clearly cannot affect his standing to appeal. Moreover, as we held in *Kentucky* v. *Graham*, 473 U. S., at 165 (footnote and citation omitted), "liability on the merits and responsibility for fees go hand in hand; where a defendant has not been prevailed against, either because of legal immunity or on the merits, [42 U. S. C.] § 1988 does not authorize a fee award against that defendant." Accord, *id.*, at 164, 168–170.

the litigation and therefore did not have standing to file the notice of appeal. As we held in *Brandon* v. *Holt, supra,* "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond." *Id.,* at 471–472. We repeated this point in *Kentucky* v. *Graham:*

> "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 690, n. 55 (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon, supra,* at 471–472. It is *not* a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." 473 U. S., at 165–166 (emphasis in original, footnote omitted).

Mr. Youngman's status as a School Board member does not permit him to "step into the shoes of the Board" and invoke its right to appeal. In this case, Mr. Youngman was apparently the lone dissenter in a decision by the other eight members of the School Board to forgo an appeal. Tr. of Oral Arg. 7. Generally speaking, members of collegial bodies do not have standing to perfect an appeal the body itself has declined to take.[7] The Court of Appeals for the District of Co-

---

[7] It might be an entirely different case if, for example, state law authorized School Board action solely by unanimous consent, in which event Mr. Youngman might claim that he was legally entitled to protect "the effectiveness of [his] vot[e]." *Coleman* v. *Miller,* 307 U. S. 433, 438 (1939). See *id.,* at 438–446; *id.,* at 456 (Black, J., concurring). But in

lumbia Circuit so held in *Smuck* v. *Hobson*, 132 U. S. App. D. C. 372, 374–375, 408 F. 2d 175, 177–178 (1969) (en banc) (footnote omitted):

> "We also find that Mr. Smuck has no appealable interest as a member of the Board of Education. While he was in that capacity a named defendant, the Board of Education was undeniably the principal figure and could have been sued alone as a collective entity. Appellant Smuck had a fair opportunity to participate in its defense, and in the decision not to appeal. Having done so, he has no separate interest as an individual in the litigation. The order directs the Board to take certain actions. But since its decisions are made by vote as a collective whole, there is no apparent way in which Smuck as an individual could violate the decree and thereby become subject to enforcement proceedings."

See *id.*, at 387, 408 F. 2d, at 190 (McGowan, J., concurring in part and concurring in result).

## VII

At oral argument Mr. Youngman advised the Court that he is the parent of at least one student attending the Williams-

---

that event Mr. Youngman would have to allege that his vote was diluted or rendered nugatory under state law and even then he would have a mandamus or like remedy against the Secretary of the School Board, cf. *id.*, at 436–437 (mandamus action "to compel a proper record of legislative action"); he would not be entitled to take legal action in the Board's authority in his own name. For the same reason, Mr. Youngman does not have standing on the rationale employed in *Board of Education* v. *Allen*, 392 U. S. 236, 241, n. 5 (1968), that he was forced to violate his constitutional oath. Unlike the members of the School Board *majority* in *Allen* who were put "in the position of having to choose between violating their oath and taking a step . . . that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts," *ibid.*, Mr. Youngman has voted his conscience and, as a member of the Board, must abide by its decision not to appeal absent some state-law provision to the contrary.

port Area High School and that as a matter of conscience he is opposed to prayer activities on school premises during regular school hours. The Solicitor General submits that Mr. Youngman's status as a parent provides an adequate predicate for federal appellate jurisdiction.

Mr. Youngman's status as an aggrieved parent, however, like any other kindred fact showing the existence of a justiciable "case" or "controversy" under Article III, must affirmatively appear in the record.[8] As the first Justice Harlan observed, "the presumption . . . is that the court below was without jurisdiction" unless "the contrary appears affirmatively from the record." *King Bridge Co.* v. *Otoe County*, 120 U. S. 225, 226 (1887). Accord, *Thomas* v. *Board of Trustees*, 195 U. S. 207, 210 (1904); *Minnesota* v. *Northern Securities Co.*, 194 U. S. 48, 62–63 (1904). That lack of standing was not noticed by either party matters not, for as we said in *Mansfield C. & L. M. R. Co.* v. *Swan*, 111 U. S. 379, 382 (1884):

> "[T]he rule, springing from the nature and limits of the judicial power of the United States, is inflexible and without exception, which requires this court, of its own motion, to deny its own jurisdiction, and, in the exercise

---

[8] "The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth* v. *Seldin*, 422 U. S. 490, 517–518 (1975). See *McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 190 (1936) ("Here, the allegation in the bill of complaint as to jurisdictional amount was traversed by the answer. The court made no adequate finding upon that issue of fact, and the record contains no evidence to support the allegation of the bill. There was thus no showing that the District Court had jurisdiction and the bill should have been dismissed upon that ground"); *Jackson* v. *Ashton*, 8 Pet. 148, 149 (1834); *Bingham* v. *Cabot*, 3 Dall. 382, 383–384 (1798).

of its appellate power, that of all other courts of the United States, in all cases where such jurisdiction does not affirmatively appear in the record on which, in the exercise of that power, it is called to act. On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it."

Accord, *Chicago, B. & Q. R. Co.* v. *Willard,* 220 U. S. 413, 419 (1911); *Kentucky* v. *Powers,* 201 U. S. 1, 35–36 (1906); *Great Southern Fire Proof Hotel Co.* v. *Jones,* 177 U. S. 449, 453 (1900). See *Thomson* v. *Gaskill,* 315 U. S. 442, 446 (1942). Moreover, because it is not "sufficient that jurisdiction may be inferred argumentatively from averments in the pleadings," *Grace* v. *American Central Ins. Co.,* 109 U. S. 278, 284 (1883); *Thomas* v. *Board of Trustees,* 195 U. S., at 210, it follows that the necessary factual predicate may not be gleaned from the briefs and arguments themselves. This "first principle of federal jurisdiction" applies "whether the case is at the trial stage or the appellate stage." P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 835–836 (2d ed. 1973).

There is nothing in the record indicating anything about Mr. Youngman's status as a parent. Nor is there anything in the record to indicate that he or his children have suffered any injury as a result of the District Court's judgment, or as a result of the activities of Petros subsequent to the entry of that judgment. For all that appears in the record, Mr. Youngman and his children might even be active supporters of Petros.

The reasons why Mr. Youngman may not take an appeal in his individual capacity also foreclose an appeal in his capacity as a parent. His interest as a parent in the outcome of the

litigation differs from his interest as a member of the School Board which, as we have already noted, is legally that of a "different legal personage." See n. 6, *supra*. Since Mr. Youngman was not sued as a parent in the District Court, he had no right to participate in the proceedings in that court in that capacity without first filing an appropriate motion or pleading setting forth the claim or defense that he desired to assert.[9] Thus, even if one were amenable to the dissent's unprecedented (and unexplained) suggestion that the principle governing determination of subject-matter jurisdiction should be relaxed on appeal, the proposed exception for litigants who were "proper part[ies]" in the District Court, *post*, at 552, would not help Mr. Youngman because he could not perfect an appeal in either capacity in which he was a "party" in the District Court, *i. e.*, as a School Board member sued in his individual capacity or as a Board member sued in his official capacity. Tacitly conceding Mr. Youngman's lack of standing on these two bases, the dissent instead would confer standing on Mr. Youngman as a parent—a capacity in which he plainly was not a party in the District Court and to which, therefore, the dissent's reasoning does not apply. Having

---

[9] Because his status as a parent was obviously different from his official status as a member of the Board, in order to participate as a parent in the District Court litigation it was incumbent upon Mr. Youngman under Rule 24 of the Federal Rules of Civil Procedure to make "timely application" by an appropriate motion "stat[ing] the grounds" for intervention and "setting forth the claim or defense for which intervention is sought." Fed. Rules Civ. Proc. 24(a), (c). No such pleading was filed in either of the courts below. It is particularly important to observe these requirements in cases in which the interest of the litigant seeking to appeal diverges from the interest of the party to the suit. In this case, Mr. Youngman's interest as a parent was not necessarily parallel to the interest of the School Board. For although the record plainly demonstrates that the School Board was interested in obeying the law—it dutifully followed its lawyer's advice when he concluded that group worship conducted on school premises would violate the Establishment Clause—it also decided not to appeal the District Court's contrary ruling, and the record does not indicate that the Board disfavored (or favored) groups such as Petros.

failed to assert his parental interest in the District Court—or to adduce any factual support for that interest in this Court— Mr. Youngman has no right to prosecute an appeal in his capacity as a parent.

We therefore hold that because the Court of Appeals was without jurisdiction to hear the appeal, it was without authority to decide the merits. Accordingly, the judgment of the Court of Appeals is vacated, and the case is remanded with instructions to dismiss the appeal for want of jurisdiction.

*It is so ordered.*

JUSTICE MARSHALL, concurring.

I join JUSTICE STEVENS' opinion for the Court. I write separately to emphasize that the parties cannot, contrary to the contention of the Solicitor General and THE CHIEF JUSTICE, invoke the Article III jurisdiction of this Court through a belated nontestimonial statement by Mr. Youngman that he is a parent of a child in the Williamsport Area High School.

This lawsuit on appeal was *not* "the same dispute between the same parties," *post,* at 551, as the one conducted in the District Court. The dispute litigated in the District Court was one between certain students wishing to conduct prayer group activities as part of an official school activity period, on the one hand, and a School Board that refused them permission to do so, on the other. Mr. Youngman participated in that lawsuit only as a member of the School Board, sued in his official capacity. The real party in interest in that lawsuit was the Board. *Kentucky* v. *Graham,* 473 U. S. 159, 165–166 (1985). That controversy ended with the entry of the District Court judgment; the School Board, voting 8–1 with Mr. Youngman in the minority, abandoned its earlier position and agreed to allow plaintiffs to conduct the prayer group activities they sought. There was therefore nothing left to litigate between those parties.

The lawsuit sought to be litigated on appeal is a different one. This dispute, under THE CHIEF JUSTICE's theory, is

one between Mr. Youngman, asserting that he is a parent of a child in the Williamsport Area High School whose First Amendment rights would be infringed by his attendance at a school whose activities impermissibly advance religion, on the one hand, and students seeking to conduct prayer group activities, on the other. The School Board itself is nowhere to be found. I do not contest that Mr. Youngman could pursue this dispute on appeal had he intervened in the lawsuit in his capacity as a parent. Absent such intervention, it is conceivable that Mr. Youngman might bottom his standing to raise such an argument on facts in the record setting out his status as a parent. There are, however, no such facts anywhere in the extensive record in this case. There is not one word in the _record_ indicating that Mr. Youngman is a father at all. Nor did Mr. Youngman claim such status in his notice of appeal. App. 166.

In fact, the brief for respondent filed in this Court suggests that Mr. Youngman did _not_ have a child in the Williamsport Area High School when he filed his notice of appeal from the District Court's decision on June 10, 1983. Benjamin Youngman, rather, apparently is claimed to have begun studying at that school several months later, in the fall of 1983. Brief for Respondent Youngman 6, and n. 3. Assertions in the parties' briefs are not part of the record for purposes of determining our jurisdiction. This discrepancy, however, illustrates the wisdom of our long-established rule requiring that the facts supporting our Article III jurisdiction "appea[r] affirmatively from the record." _King Bridge Co._ v. _Otoe County_, 120 U. S. 225, 226 (1887).

Because no facts appear in the record supporting Mr. Youngman's status as the parent of a child enrolled in the Williamsport Area High School opposed to petitioners' activities, I join the opinion and judgment of the Court vacating the judgment below and remanding with instructions to dismiss the appeal for want of jurisdiction.

CHIEF JUSTICE BURGER, with whom JUSTICE WHITE and JUSTICE REHNQUIST join, dissenting.

I agree with the Court that the judgment of the District Court allowing Petros to meet during the student extracurricular activity period must be reinstated. Because respondent Youngman had standing to appeal, however, I would reach the merits of this dispute and reverse the judgment of the Court of Appeals.

## I

Mr. Youngman is a parent of a student at Williamsport High School; as a matter of conscience he is opposed to prayer activities on school premises during school hours. As this Court has repeatedly held, parents have standing to challenge conditions in public schools that their children attend. See *Engel* v. *Vitale*, 370 U. S. 421 (1962); *Zorach* v. *Clauson*, 343 U. S. 306 (1952). The Court's principal objection to Youngman's standing as a parent stems from his failure "'to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.'" *Ante*, at 545–547, and n. 8 (quoting *Warth* v. *Seldin*, 422 U. S. 490, 518 (1975)). It is, of course, perfectly sensible to impose such pleading burdens upon the plaintiff who initiates the litigation. These burdens, however, need not be placed upon a properly named defendant, like Mr. Youngman, who seeks to invoke the jurisdiction of the Court of Appeals. Once the jurisdiction of the district court over a particular dispute is established, it seems clear that the same dispute between the same parties will remain within the Article III powers of the courts on appeal. To be sure, we require that the case or controversy requirement be met throughout the course of the litigation. But the method for determining whether the case or controversy exists and the burdens placed on the parties should not, indeed cannot, be the same on appeal as in the district court. At the district court stage, the facts required by

*Warth, supra,* should normally appear on the face of the complaint. At the appellate stage, however, the "complaining party" does not allege any facts but merely identifies himself as a party to the case in the district court and challenges the validity of that decision. Only if the appellant's standing is challenged must he allege facts sufficient to convince the court of appeals that he is a proper party to pursue the appeal. Here, petitioners not only failed to challenge Youngman's standing before the Court of Appeals, they also conceded that, had they challenged Youngman's standing, he would have satisfied the *Warth* standing test. Tr. of Oral Arg. 5.

## II

I would reach the issue the Court granted certiorari to address: whether the Establishment Clause requires a public high school to prevent a student-initiated, student-led group from meeting during an extracurricular activity period.

The Establishment Clause prohibits Congress and, through the Fourteenth Amendment, the States from passing any law "respecting an establishment of religion." As we have observed on other occasions, the precise contours of this prohibition remain unclear. But it is common ground that nothing in the Establishment Clause requires the State to suppress a person's speech merely because the *content* of the speech is religious in character. In *McDaniel* v. *Paty*, 435 U. S. 618, 641 (1978), JUSTICE BRENNAN emphasized in his opinion concurring in the judgment that "[t]he Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities." And more recently, in *Widmar* v. *Vincent*, 454 U. S. 263 (1981), we held that the Establishment Clause did not justify a university's content-based exclusion of religious speech from a forum generally open to student groups.

*Widmar* clearly controls the resolution of this case. Petros is á student-initiated and student-led group seeking the same forum available to other student extracurricular activity groups. The students would have been allowed to meet to discuss moral philosophy or Marxism, to practice French, or to play chess; but, since they chose to worship, the school decided that it could not allow the group to meet without violating the Establishment Clause.

The Court of Appeals agreed that the Establishment Clause prohibited Petros from meeting on school premises because to allow it to meet could have been misinterpreted by other students as active state support of religion. Under that analysis, because an individual's discussion of religious beliefs may be confused by others as being that of the State, both must be viewed as the same. Yet the several commands of the First Amendment require vision capable of distinguishing between *state* establishment of religion, which is prohibited by the Establishment Clause, and *individual* participation and advocacy of religion which, far from being prohibited by the Establishment Clause, is affirmatively protected by the Free Exercise and Free Speech Clauses of the First Amendment. If the latter two commands are to retain any vitality, utterly unproven, subjective impressions of some hypothetical students should not be allowed to transform *individual* expression of religious belief into *state* advancement of religion.

No one would contend that the State would be authorized to dismantle a church erected by private persons on private property because overwhelming evidence showed that other members of the community *thought* the church was owned and operated by the State. That the "primary effect" of state inaction might turn out to advance the cause of organized religion has no bearing upon the threshold question of whether the challenged activity is conducted by the State or by individuals.

The Establishment Clause mandates state neutrality, not hostility, toward religion. As Justice Black stated for the Court in *Everson* v. *Board of Education*, 330 U. S. 1, 18 (1947), the First Amendment "requires the state to be neutral in its relations with groups of religious believers and nonbelievers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them." In *Zorach* v. *Clauson*, 343 U. S. 306 (1952), the Court upheld a state law allowing schools to release students, during school hours, so that they could receive religious instruction elsewhere. Although the State did not compel students to go to religious classes, the program undoubtedly advanced the cause of religion. Justice Douglas, writing for the Court, eloquently rejected the suggestion that the program thereby violated the Establishment Clause:

> "We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups." *Id.*, at 313–314.

By granting the student prayer group equal access to the student activity forum, the order of the District Court "follows the best of our traditions," *id.*, at 314, and is wholly

consistent with the Constitution. Although I would have reached this issue on the merits, it is appropriate that the Court, by vacating the judgment of the Court of Appeals, restores the sound analysis and judgment of the District Court.

JUSTICE POWELL, dissenting.

I agree with THE CHIEF JUSTICE that respondent Youngman has standing to appeal, and also agree with much of his dissenting opinion. I write briefly to say that on its merits, this case is controlled by *Widmar* v. *Vincent,* 454 U. S. 263 (1981).

As in that case, respondent School District simply had "created a forum generally open for use by student groups." *Id.,* at 267. The School District provided 30-minute periods on Tuesdays and Thursdays for high school students to meet in groups in separate school rooms for extracurricular activities, including discussion or debate on any subject of their choosing. A religious group was formed for reading passages of scripture and for prayer. Although there were no complaints by students, faculty, or parents, on the basis of a legal opinion the Principal advised the group that it could not meet during these periods. As THE CHIEF JUSTICE observes in his dissent, this is "a student-initiated and student-led group seeking the same forum available to other student extracurricular activity groups." *Ante,* at 553. At the time of this suit, there was a total of 25 identified groups, each organized by students. All of these groups were free to discuss any subject other than a religious one.

In *Widmar,* under essentially the same circumstances, we held that the University of Missouri at Kansas City had "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in religious worship and discussion. These are forms of speech and association protected by the First Amendment." 454 U. S., at 269. The only arguable distinction between *Widmar* and this case is that *Widmar* involved university students while the groups here are composed of high school

students. We did note in *Widmar* that university students are "less impressionable than younger students and should be able to appreciate that the University's policy is one of neutrality toward religion." *Id.*, at 274, n. 14. Other decisions, however, have recognized that the First Amendment rights of speech and association extend also to high school students. See, *e. g., Board of Education* v. *Pico*, 457 U. S. 853, 864 (1982) (opinion of BRENNAN, J.); *Tinker* v. *Des Moines School District*, 393 U. S. 503, 506–507 (1969) (citing cases). I do not believe—particularly in this age of massive media information—that the few years difference in age between high school and college students justifies departing from *Widmar*. I accordingly dissent.