**AXESS INTERNATIONAL, LTD.**
**Plaintiff–Appellee,**

v.

**INTERCARGO INSURANCE**
**COMPANY, Defendant–**
**Appellant.**

No. 98–35133.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1999

Filed July 29, 1999

936

Stephen L. Bucklin, Countryman &
McDaniel, Los Angeles, California, for the
defendant-appellant.

Robert J. Bocko, Keesal, Young & Lo-
gan, Seattle, Washington, for the plaintiff-
appellee.

Before: Thomas M. Reavley,[1] Arthur L. Alarcon and M. Margaret McKeown, Circuit Judges.

ALARCON, Circuit Judge:

Intercargo Insurance Company ("Intercargo") appeals from the district court's grant of summary judgment in favor of Axess International, Ltd. ("Axess"). Intercargo issued a $50,000 surety bond to Max Bright Services, Ltd. ("Max Bright"), a non-vessel-operating common carrier which breached its contract with Axess to transport goods from Hong Kong to Long Beach, California. Intercargo contends that it is not liable on the bond because (1) Axess's release of its claims against Max Bright operates as a release of its claims against Intercargo, and (2) the Hong Kong default judgment obtained by Axess against Max Bright does not arise out of the transportation-related activities of Max Bright under § 1721(b) of the Shipping Act of 1984. Intercargo also contends that the district court erroneously determined that Axess's state law claims are not preempted by federal law and that Washington law applies to those claims.

We affirm the district court's grant of summary judgment because we conclude that the release signed by Max Bright did not release Intercargo from liability. We also decide, as a matter of first impression, that misdelivery of goods is a transportation-related activity under § 1721(b) of the Shipping Act of 1984. Because the district court declined to exercise jurisdiction over Axess's remaining state law claims, we reverse that portion of the district court's order which purported to resolve the question whether federal law preempted any state law remedies and which state's laws should be applied to Axess's state law claims.

## I

On October 28, 1995, Axess, a Hong Kong company, delivered to Max Bright a shipment of 379 cartons of silk clothing ("the goods") to be transported from Hong Kong to Long Beach, California and delivered to Cloth to Clothing, Inc. ("CTCI"), the buyer. Max Bright issued the bill of lading and served as the non-vessel-operating common carrier ("NVOCC") in this transaction. An NVOCC is an intermediary between a shipper of goods and an operator of a vessel that carries the goods. As required by the Shipping Act of 1984, Max Bright purchased a $50,000 surety bond to cover any damages arising from its transportation-related activities. *See* 46 U.S.C.App. § 1721(a) & (b).[2] Intercargo issued the surety bond.

The goods arrived in Long Beach in November of 1995. Max Bright's agent in Long Beach, Maverick Distribution Services, Inc., received the goods and stored them at a government warehouse. Due to problems with obtaining a proper letter of credit from CTCI, Axess directed Max Bright on May 7 and June 28, 1996 to return the goods to Hong Kong. Instead, the goods were released to CTCI.

Axess filed suit against Max Bright in Hong Kong, seeking damages for misdelivery of the goods. On November 25, 1996,

---

**1.** The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

**2.** During the time period relevant to this case, those sections provided:

(a) Each non-vessel-operating common carrier shall furnish to the [Federal Maritime] Commission a bond, proof of insurance, or other such surety, as the Commission may require, in a form and an amount determined by the Commission to be satisfactory to insure the financial responsibility of that carrier.

(b) A bond, insurance, or other surety obtained pursuant to this section shall be available to pay any judgment for damages against a non-vessel-operating common carrier arising from its transportation-related activities under this chapter.

46 U.S.C.App. § 1721. Those sections have been repealed by the Ocean Shipping Reform Act of 1998, Pub.L. No. 105–258, 112 Stat. 1902, which became effective May 1, 1999.

the Hong Kong Supreme Court issued a default judgment in favor of Axess in the amount of US$141,960 plus interest and costs. Because Max Bright had become a dormant company and was unable to satisfy the judgment, Axess entered into a release (what the parties termed a "deed") with Chan Wing Kwan ("CWK"), a shareholder and director of Max Bright. In exchange for payment of HK$200,000 (about US$27,000) by CWK, Axess agreed to "take no further action to enforce the said judgment against Max, CWK, or any other director or shareholder of Max." The release included a clause which stated: "This Deed shall not affect any rights Axess may have to claim or take any proceedings against any other parties for the matters arising out of Bill of Lading No. OK/LAX–16788 save and except Maverick Distribution Services, Inc. against which Axess will not make any claim."

Axess subsequently submitted a written claim to Intercargo requesting payment on the bond. When Intercargo failed to pay, Axess filed this action on August 5, 1997, seeking $50,000 on its federal law bond claim, as well as damages for its state law claims for violation of the Washington Consumer Protection Act and insurance bad faith. Axess also prayed for attorney's fees under Washington law.

On October 16, 1997, Axess filed a motion for partial summary judgment and for entry of final judgment on the bond claim. On November 3, 1997, Intercargo filed its opposition to Axess's motion and its own motion for summary judgment on all claims.

The district court granted Axess's motion for summary judgment on the bond claim, denied Intercargo's cross motion for summary judgment, and dismissed without prejudice Axess's remaining claims as state law claims over which it declined to exercise jurisdiction. The court entered judgment awarding $50,000 plus interest and costs to Axess on January 21, 1998. Intercargo filed a timely appeal. We have jurisdiction under 28 U.S.C. § 1291.

## II

Intercargo contends that it is not liable to Axess on the surety bond because the release signed by Max Bright also released Intercargo. The district court held that Axess, by including language in the release reserving its right to proceed against "any other parties," effectively preserved its right to proceed against Intercargo. We review *de novo* the district court's grant of summary judgment. *See Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998).

The release signed by Axess and CWK, an agent of Max Bright, contains the following language: "This Deed shall not affect any rights Axess may have to claim or take any proceedings against any other parties for the matters arising out of Bill of Lading No. OK/LAX–16788." Intercargo argues that under *Hardaway Co. v. Amwest Surety Ins. Co.*, 15 F.3d 172 (11th Cir.1994), and the Restatement (Third) of Suretyship and Guaranty § 39 (1995), Axess failed properly to preserve its rights against Intercargo because it did not explicitly name Intercargo in the reservation of rights clause.

Intercargo's reading of *Hardaway* is incorrect. In *Hardaway*, the prime contractor brought an action against the surety of a defunct sub-contractor. 15 F.3d at 173. The contractor had signed a release of its claims against the subcontractor regarding default on the subcontract but had specifically reserved its rights against the surety in the release. The district court found that under Georgia law, the surety was released because it had not consented to the release of the subcontractor, the principal debtor. *See id.* at 172. The Eleventh Circuit Court of Appeals, finding "confusion" in prior Georgia case law, certified the following question to the Georgia Supreme Court:

> Whether a creditor's agreement to release a principal debtor, which contains an express reservation of rights against the surety, is a release of the surety's liability to the creditor on the surety

bond or a mere covenant by the creditor not to sue the principal debtor when the surety has not consented to the creditor's release of the principal debtor? *Id.* at 173. In response, the Georgia court affirmed the rule of *Schwitzerlet–Seigler Co. v. Citizens & Southern Bank,* 155 Ga. 740, 746, 118 S.E. 365, 367 (1923), which held: " '[T]he release of the principal debtor, without the consent of the surety, releases the surety, unless the right to go against the surety is reserved in the instrument of release, or it appears from the whole transaction that the surety should remain bound.' " *Id.* at 174. This rule reflects the Restatement of the Law Security § 122,[3] the predecessor to Restatement (Third) of Suretyship and Guaranty § 39(b), and is consistent with case law from other jurisdictions. *See, e.g., Security Nat'l Bank of Kansas City v. Continental Ins. Co.,* 586 F.Supp. 139, 146 (D.Kan. 1982) ("As a general rule, discharge of a principal debtor by a creditor discharges the surety, unless the surety has consented to remain liable 'or the creditor reserves rights against the surety."); *Mulligan v. Hall,* 229 Conn. 224, 227, 640 A.2d 108, 109–10 (1994) ("Even without an express reservation of rights, a general release discharges only those joint tortfeasors whom the contracting parties actually intended to be released."); *Continental Bank & Trust Co. v. Akwa,* 58 Wis.2d 376, 392, 206 N.W.2d 174, 183 (1973) ("It is generally held that where the creditor releases the principal, an express reservation will preserve his claim against the surety."). There is nothing in the holding in *Hardaway* or these other cases which requires an obligee to name specifically the secondary obligor in a reservation of rights clause in order to reserve its rights against the secondary obligor.

Nor does the Restatement (Third) of Suretyship and Guaranty support Intercargo's contentions. Section 39(b) of the Restatement provides that a release of the principal also releases the surety "unless (i) the terms of the release effect a preservation of the secondary obligor's recourse (§ 38); or (ii) the language or circumstances of the release otherwise show the obligee's intent to retain its claim against the secondary obligor." Restatement (Third) of Suretyship and Guaranty § 39(b). In analyzing this language, the district court correctly surmised that "nothing in this clause requires the obligee to mention the surety by name." Furthermore, comment d to this section of the Restatement makes clear that the intent of the obligee in granting the release controls whether a secondary obligor is released. Comment d provides in relevant part:

> *d. Discharge of secondary obligor-obligee's intent.* An obligee may release the principal obligor from its duties ... in a number of different circumstances. In some cases, such as an accord and satisfaction, the release is intended to discharge all claims of the obligee.... In those cases, the secondary obligor is discharged by the release. In other cases, however, the release is intended to discharge only the obligee's claim against the principal obligor, leaving the obligee free to pursue the secondary obligor. Paragraph (b) does not discharge the secondary obligor when the release is intended to discharge only the principal obligor. This intent can be manifested in a provision of the release effecting a preservation of recourse of the secondary obligor or otherwise indicating that the secondary obligor remains liable, or inferred from circumstances that indicate such intent.

Restatement (Third) of Suretyship and Guaranty § 39 cmt. d. Here, by including a clause in the release granted to Max Bright reserving its right "to claim or take any proceedings against any other party," Intercargo clearly manifested its intent to release only Max Bright, the principal obli-

---

**3.** That section provided: "Where the creditor releases a principal, the surety is discharged, unless (a) the surety consents to remain liable notwithstanding the release; *or* (b) the credi-

tor in the release reserves his rights against the surety." Restatement of the Law of Security § 122 (1941) (emphasis added).

gor, and Maverick, a subsidiary of Max Bright.

## III

Intercargo also argues that the district court erred in concluding that the Hong Kong judgment arose from the "transportation-related activities" of Max Bright. Intercargo would not be liable on the bond if the judgment did not arise from "transportation-related activities" because the bond only covers these activities, the minimum required by law for NVOCC bonds at the time. *See* 46 U.S.C.App. § 1721(b) (repealed 1999).

Intercargo contends that the judgment does not arise from "any activity of [Max Bright], much less any transportation-related activity under the Shipping Act of 1984." Intercargo maintains that because the goods never cleared through United States customs and were seized and placed in a government warehouse, Max Bright could not control the disposition of the goods.

We reject Intercargo's attempt to have this court reevaluate the merits of the Hong Kong judgment. Axess has cited an unpublished district court opinion, *Trans Ocean Container Corp. v. Intercargo Ins. Co.*, No. C95–2187, 1996 WL 390323 (N.D.Cal. July 3, 1996), to support its contention that Intercargo cannot relitigate the issues before the Hong Kong court when it issued the default judgment. In *Trans Ocean Container Corp.*, the district court relied on a default judgment against the NVOCC to hold the surety liable on its bond. The court stated: "As this Court does not have jurisdiction to disturb the default judgment, the Court assumes the veracity of the issues adjudicated there." *Id.* at *3. Although Intercargo correctly points out that "the *Trans Ocean* decision does not cite any authority for the proposition that default judgments are sacrosanct," the conclusion of the district court

is clearly supported by the law of suretyship.

 Generally, a default judgment obtained by an obligee against a principal obligor does not have preclusive effect in a subsequent action against a secondary obligor. *See* Restatement (Third) of Suretyship and Guaranty § 67(3). Where a judgment bond is involved, however, such as the one at issue here, a different rule applies:

> Where the very condition of the bond is the performance of a judgment against the principal, or that the surety will pay all damages that may be awarded in an action brought against the principal, ... there is no question as to the conclusiveness, as against the surety, of a judgment against the principal, if binding upon the latter and free from fraud and collusion, assuming, of course, that it is the kind of judgment contemplated by the surety's undertaking.

74 Am.Jur.2d *Suretyship* § 153 (1974).[4] The bond at issue here states that "the condition of this obligation is that the penalty amount of this bond [$50,000] shall be available to pay *any judgment for damages* against the Principal arising from the Principal's transportation related activities." (emphasis added). Since the bond was issued by Intercargo specifically to pay any judgment for damages against Max Bright, we are not at liberty to reexamine the decision of the Hong Kong Supreme Court.

Because we cannot consider Intercargo's arguments concerning the merits of the Hong Kong judgment, and Intercargo does not contend that the Hong Kong judgment is not entitled to full faith and credit, our review is limited to two questions: (1) the basis of the Hong Kong judgment, and (2) whether or not that act constituted a "transportation-related activity" under § 1721(b) of the Shipping Act of 1984.

---

4. Thus, the cases cited by *Intercargo* in its reply brief are inapposite because they do not address judgment bonds.

■ The Hong Kong Supreme Court entered a default judgment against Max Bright because it failed to respond to a complaint filed by Axess. Axess alleged in its complaint that it delivered to Max Bright "379 cartons of silk garments ('the goods') to be carried by the Defendant from Hong Kong to Long Beach, Los Angeles, U.S.A., and there to be delivered to one cloth to clothing Inc (CTCI) for reward." Axess further alleged that due to the failure of CTCI to make payment, Axess directed Max Bright not to release the goods, but to return them to Hong Kong. Axess asserted that it was entitled to damages totalling US$141,960, plus interest and costs, on the ground that "in breach of the contract or duty, the Defendant or his agent wrongfully and without authority released the goods to CTCI without production of the relevant bill of lading, thereby converting the said goods." Based on the plain language of the complaint, we hold that the district court did not err in concluding that the default judgment was entered because Max Bright misdelivered the goods shipped by Axess.

We next consider whether misdelivery of goods constitutes a transportation-related activity. This is not only an issue of first impression in this circuit, but is also the first time any United States Court of Appeals has been called upon to interpret the phrase "transportation-related activity" under 46 U.S.C.App. § 1721(b). Section 1721(b) was added to the Shipping Act in 1990, *see* Non–Vessel–Operating Common Carrier Amendments of 1990, Pub.L. No. 101–595, § 710, and repealed by Congress in 1998.[5]

■ We hold that misdelivery of goods constitutes a "transportation-related activit[y]" under § 1721(b). "In construing a statute in a case of first impression, we look to the traditional signposts of statutory construction: first, the language of the statute itself; second, its legislative history, and as an aid in interpreting Congress' intent, the interpretation given to it by its administering agency." *See Funbus Sys., Inc. v. State of California Pub. Utils. Comm'n,* 801 F.2d 1120, 1125 (9th Cir. 1986) (internal quotation marks and citation omitted). Although § 1721 does not define "transportation-related activities," the legislative history of the 1990 amendments to the Shipping Act indicates that Congress intended that the phrase be interpreted broadly. The House Report describes the need for the legislation as follows:

> The [Federal Maritime Commission] has reported receiving an increasing number of complaints concerning the activities of NVOCCs ... from all segments of the ocean transportation industry-shippers, importers, ocean freight forwarders, ocean common carriers, terminal operators, and ports. These offending NVOCC practices include: *failure to deliver cargo,* failure to honor loss and damage claims, and abandonment of cargo at ports throughout the world. These problems are exacerbated by the fact that many NVOCCs lack significant tangible assets. As a result, many persons injured by NVOCC actions are not able to recover their loss.

H.R.Rep. No. 101–785, at 2 (1990) (emphasis added). The committee issuing the report believed that "[t]he bonding requirement ... should resolve most of these problems," *id.* at 2, and noted that "[t]he object of [the bill] is ... to compel NVOCCs to comply with the applicable law to the benefit of all who deal with them." *Id.* at 3. The NVOCC action at issue here, misdelivery of goods, clearly falls within the range of problems Congress intended to correct by requiring that an NVOCC post a judgment bond.

---

5. The bonding requirements for NVOCCs have changed slightly and are now described in 46 U.S.C.App. § 1718, which consolidates the rules for NVOCCs and ocean freight forwarders into a new category, "ocean transportation intermediaries." *See* Ocean Shipping Reform Act of 1998, Pub.L. No. 105–258, § 116, 112 Stat.1902 (Oct. 14, 1998); S.Rep. No. 105–61 (July 31, 1997).

Our interpretation of the statute is consistent with the views of the Federal Maritime Commission ("FMC"). The commentary to the FMC's final rule governing bonding of NVOCCs indicates that the agency interprets the 1990 amendments, including the phrase "transportation-related activity," broadly. *See* Bonding of Non–Vessel–Operating Common Carriers, 56 Fed.Reg. 51987 (Oct. 17, 1991). During the rulemaking process, comments were submitted to the FMC by various participants in the NVOCC industry (including Intercargo), suggesting ways the proposed bond form could be narrowed or limited. The FMC rejected these suggestions and concluded: "The language in the bond form limiting the bond to an NVOCC's 'transportation-related activities' tracks the express language of the 1990 Amendments. There does not appear to be any sound basis or reason for otherwise narrowing the scope of the bond." *Id.* at 51991. The FMC also noted: "Nor do we believe that we can limit the bond to only judgments obtained in the United States. The bond is available to 'pay any judgment for damages' against an NVOCC, and is not limited to only conduct by an NVOCC in this country." *Id.*

Based on the legislative history of the 1990 amendments adding § 1721 to the Shipping Act, and the FMC's interpretation of this section, we affirm the district court's conclusion that the Hong Kong judgment arose out of the "transportation-related activities" of Max Bright, and the entry of judgment in favor of Axess on its bond claim.[6]

### IV

In addition to its claim on the maritime surety bond, Axess asserted three state law claims against Intercargo: (1) insurance bad faith, (2) violation of the Washington Consumer Protection Act, and (3) attorney's fees. In its answer, Intercargo asserted as an affirmative defense that "Washington law does not apply to this case by virtue of plaintiff's invocation of admiralty and maritime jurisdiction and because Washington law is preempted by federal law, including but not limited to the Shipping Act of 1984." In Intercargo's cross-motion for summary judgment, its reply to Axess's opposition to its cross-motion, and on appeal, Intercargo continues to argue that Axess's state law claims are preempted by federal law. Intercargo also asserted before the district court, and asserts before us, that "even assuming arguendo that state law could apply, ... that state would not be Washington." Intercargo did not suggest (until its reply brief) what state's law might instead apply.

On January 5, 1998, the district court issued an amended order granting Axess's partial summary judgment motion and denying Intercargo's motion for summary judgment on all claims. After discussing its decision to enter judgment for Axess on the bond claim, the district court turned to the state law claims. The court first rejected Intercargo's preemption arguments and held that "state law remedies are available to Axess." The court next considered the choice of law issue and held that "Washington law should be applied." Finally, the court stated that since it had

---

**6.** While we are mindful that unpublished opinions have no precedential value, we note that the three other district courts to have considered the meaning of "transportation-related activities" under § 1721 have concluded that the phrase is to be read broadly. *See P & O Containers Ltd. v. American Motorists Ins. Co.,* No. 96 Civ. 8244, 1998 WL 146229 (S.D.N.Y. March 25, 1998) ("[T]he enforcement of a liquidated damages clause of a service contract between a carrier and an NVOCC arises out of the NVOCC's 'transportation-related activities.' "); *P & O Containers*

*v. American Motorists Ins. Co.,* No. CV–96–5828–R (C.D. Cal. April 17, 1997) (holding that a default judgment for liquidated damages for failure to meet the minimum volume requirement of a service agreement arose from the "transportation-related activity" of the NVOCC); *Trans Ocean Container Corp. v. Intercargo Ins. Co,* No. C95–2187, 1996 WL 390323 (N.D.Cal. July 3, 1996) (holding that the leasing of ocean cargo containers by an NVOCC was a "transportation-related activity").

entered judgment on the only federal claim in the case, it "declines to exercise supplemental jurisdiction over these state law claims," citing 28 U.S.C. § 1367. The court then dismissed these claims without prejudice "to allow plaintiff to pursue these claims in state court."

■ Because neither party has contested the district court's decision to decline to exercise supplemental jurisdiction over Axess's remaining state law claims, we are "not required, sua sponte, to decide whether the district court abused its discretion under § 1367(c)." *Acri v. Varian Associates, Inc.,* 114 F.3d 999, 1000 (9th Cir.1997) (en banc). In *Acri,* we explained: "This is because a federal district court with power to hear state law claims [under § 1367(a)] has discretion to keep, or decline to keep, them under the conditions set out in § 1367(c)...." *Id.* Thus, although *Acri* specifically addressed a district court's decision to exercise its discretion in favor of retaining jurisdiction, we believe that the same principle applies to a district court's decision to decline jurisdiction over supplemental state law claims.

The parties have also failed to discuss the question whether the district court had jurisdiction to decide the issues of preemption and choice of law after it declined, under § 1367(c), to exercise supplemental jurisdiction over Axess's state law claims. Although, as noted above, we are not required to determine sua sponte whether the district court appropriately exercised its discretion in declining jurisdiction, *see Acri,* 114 F.3d at 1000–1001, we must consider whether the district court properly considered the merits of Intercargo's preemption defense to Axess's state law claims, and the choice of law issue, after

declining to exercise its jurisdiction over these causes of action. *See Arizonans for Official English v. Arizona,* 520 U.S. 43, 73, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). In *Arizonans for Official English,* the Supreme Court reiterated the conclusion it had earlier reached in *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). *Id. Bender* held that:

> [E]very federal appellate court has a special obligation to "satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review," even though the parties are prepared to concede it. "And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it. [When the lower federal court] lack[s] jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit."

*Id.* at 541, 106 S.Ct. 1326 (alterations in original) (citations omitted).

■ We conclude that once the district court chose not to exercise supplemental jurisdiction over Axess's supplemental state law claims, it lacked the power to adjudicate the merits of these claims, including Intercargo's affirmative defense of preemption [7] and the issue of choice of law. *See Gold v. Local 7 United Food and Commercial Workers Union,* 159 F.3d 1307, 1311 (10th Cir.1998) ("Having declined [to exercise supplemental] jurisdiction, however, the district court should not have reached the merits of the outrageous conduct claim."). In *Steel Co. v. Citizens*

---

7. "Federal pre-emption is ordinarily a federal defense to the plaintiff's suit." *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Only if the jurisdictional doctrine of "complete preemption" applied would the court be required to treat Axess's state law claims as "recharacterized" federal law claims and exercise federal jurisdiction. *See id.* at 64, 107 S.Ct. 1542 (holding that the complete preemption doctrine applies to claims that fall within

§ 502(a)(1)(B) of ERISA). Intercargo does not appear to make a complete preemption argument, and moreover, the complete preemption doctrine is a very limited one, to date recognized by the Supreme Court in only three contexts: under Section 301 of the Labor Management Relations Act, under Section 1132 of ERISA, and in certain cases involving tribal claims. *See* 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3522 (1999 Supplement).

*for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), the Supreme Court rejected the doctrine of "hypothetical jurisdiction," under which courts had reached the merits of a case before deciding jurisdiction, and noted that: " 'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.' " *Id.* at 94, 118 S.Ct. 1003 (quoting *Ex parte McCardle,* 7 Wall. 506, 514, 19 L.Ed. 264 (1868)). The Court also noted: "For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Id.* at 102, 118 S.Ct. 1003. In this case, the district court erred in discussing the merits of Intercargo's preemption defense to Axess's state law claims, and which state's law controls, when it declined to exercise jurisdiction over Axess's supplemental state law claims.

## V.

The district court's order granting summary judgment to Axess on the bond claim is AFFIRMED. That portion of the district court's order addressing preemption and choice of law is VACATED.