

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-15-2003

# Donovan v. Punxsutawney Area

Precedential or Non-Precedential: Precedential

Docket No. 02-3897

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Donovan v. Punxsutawney Area" (2003). *2003 Decisions.* Paper 322.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/322

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 15, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 02-3897

———

MELISSA DONOVAN, A Minor, By MICHAEL DONOVAN
and JULIE DONOVAN, Her Parents,

Plaintiff-Appellant,

v.

THE PUNXSUTAWNEY AREA SCHOOL BOARD;
DR. J. THOMAS FRANTZ, Individually and in his Capacity
as Superintendent of the Punxsutawney Area High School;
ALLEN TOWNS, Individually and in his Capacity as
Principal of the Punxsutawney Area High School; and
DAVID LONDON, Individually and in his Capacity as
Principal of the Punxsutawney Area High School,

Defendants-Appellees.

———

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 02-CV-205)
District Judge: The Honorable Donetta W. Ambrose

———

Argued: May 14, 2003

Before: RENDELL, SMITH and ALDISERT, *Circuit Judges*

(Filed: July 15, 2003)

———

Lawrence G. Paladin, Jr. (argued)
Participating Attorney for The
 Rutherford Institute
Paladin Law Offices
1700 Frankstown Road, Suite 305
Pittsburgh, Pennsylvania
 15235-3049

John W. Whitehead
Steven H. Aden
Rita Dunaway
M. Casey Mattox
The Rutherford Institute
112 Whitewood Road
Charlottesville, Virginia 22901
*COUNSEL FOR APPELLANT*

Eric W. Treene (argued)
Ralph F. Boyd, Jr.,
 Assistant Attorney General
J. Michael Wiggins,
 Principal Deputy Attorney General
Mark L. Gross
Andrea Picciotti-Bayer
United States Department of Justice
Civil Rights Division
Appellate Section-PHB 5502
950 Pennsylvania Avenue NW
Washington, D.C. 20530-0001
*AMICUS CURIAE IN SUPPORT
OF APPELLANT*

Kimberlee Wood Colby
Gregory S. Baylor
Nathan A. Adams
Center for Law and Religious
 Freedom of the Christian Legal
 Society
4208 Evergreen Lane
Suite 222
Annandale, Virginia 22003
*AMICUS CURIAE IN SUPPORT
OF APPELLANT*

Michael D. Seymour (argued)
Feczko and Seymour
Suite 520, Grant Building
310 Grant Street
Pittsburgh, Pennsylvania 15219
*COUNSEL FOR APPELLEES*

---

## OPINION OF THE COURT

---

ALDISERT, *Circuit Judge.*

Former Punxsutawney Area High School student Melissa Donovan appeals from an adverse decision concluding that the Equal Access Act did not entitle her to convene a Bible club during her school's morning "activity period" — a time during which other noncurriculum related student groups met. Specifically, she appeals from the District Court's denial of her motion for a preliminary injunction and the court's simultaneous determination that the "activity period" did not qualify as "noninstructional time" under the Equal Access Act, 20 U.S.C. § 4071 *et seq.*, such that the EAA's limited open forum mandates were not triggered. She also contends that the District Court incorrectly concluded that the First Amendment's Establishment Clause prohibits the Bible club from meeting during the activity period.

Because Donovan has graduated pending this review,[1] we conclude that her request for injunctive and declaratory relief is moot, but that her claims for damages and attorney's fees remain viable. Accordingly, as part of deciding whether the EAA requires that Punxsutawney Area High School allow the Bible club to meet during the activity period, we must determine, in particular, whether "noninstructional time" encompasses the activity period at issue so as to trigger the EAA. We conclude that it does. We also conclude that PAHS has engaged in impermissible viewpoint discrimination under the First Amendment and that speculative Establishment Clause concerns do not

---

1. Although she has now graduated, the opening briefs were filed and oral argument took place while she was still a student, during which time she was referred to as such. We will do the same.

justify PAHS's preventing the Bible club from meeting during the activity period.

## I.

### A.

Punxsutawney Area High School (PAHS) is a Punxsutawney Area School District public secondary school that receives federal financial assistance. Following a 10-minute homeroom period each day from 8:05 a.m. to 8:15 a.m., PAHS holds an "activity period" from 8:15 a.m. until 8:54 a.m. During the activity period, students have free reign in a closed universe. They may go to club meetings, study hall or student government gatherings. They may take make-up tests, hang out in the gymnasium or library, or attend tutoring programs and college test prep clinics. Alternatively, they may remain in homeroom. Students may not, however, leave the campus. The first classroom period begins immediately after this activity period.

Through an informal permission process, PAHS grants official recognition to the clubs that meet during the activity period. With official recognition, a club may post signs about upcoming meetings and gain access to the public address system. Each club must have a faculty sponsor who monitors — but is not required to participate actively in — club meetings. Among the voluntary, noncurriculum related groups that meet during the activity period are the ski club, an anti-alcohol and anti-tobacco club called Students Against Destructive Decisions, and the future health services club.

Appellant Melissa Donovan is a PAHS senior who leads a Bible club known as FISH. The club — which focuses on community services and other issues of concern to students of [PAHS] from a Christian perspective — begins and ends every meeting with a prayer. Although Donovan never asked permission for FISH to meet as a club during the activity period because she "knew" that the answer would be "no," Appellees Punxsutawney Area School Board, District Superintendent J. Thomas Frantz, former PAHS Principal Allen Towns and current PAHS Principal David

London have stipulated that FISH may not meet during the activity period due to the club's religious ties. FISH is not recognized as an official school club, but the School Board has permitted the club to meet at PAHS before mandatory attendance from 7:15 a.m. until 7:50 a.m. — a time during which no other club meets.

## B.

On January 23, 2002, Donovan — through her parents — brought suit under the First Amendment, the Fourteenth Amendment, 42 U.S.C. § 1983 and the Equal Access Act, 20 U.S.C. § 4071 *et seq.* In her initial complaint, she sought "[a] temporary restraining order, a preliminary injunction, and a permanent injunction" prohibiting the defendants from denying her access to school facilities for the Bible club during the activity period; "nominal damages, presumed damages, and/or compensatory damages"; "punitive damages"; and "all compensable costs and attorney's fees[.]" App. II at 4. She contended that PAHS and the School Board improperly infringed on her First Amendment right to free speech by denying FISH access to school facilities solely on the basis of the club's religious nature. Donovan moved for a preliminary injunction to force PAHS and the School Board to permit FISH to meet during the activity period pending a final decision. After a hearing, the District Court denied the motion in its Findings of Fact, Conclusions of Law and Order of September 13, 2002, concluding that Donovan was not likely to succeed on the merits of her claims. The District Court held that the EAA did not apply to the activity period because the activity period did not qualify as "noninstructional time" as that term is defined in the statute. It also held that the school's refusal to allow the club to meet during the activity period did not violate the First Amendment because school officials had a compelling interest in not violating the Establishment Clause — outweighing Donovan's First Amendment interests.

On October 10, 2002, upon the agreement of the parties that the district court's denial of the preliminary injunction resolved all the issues, the district court entered a Final

Order closing the case and denying all relief. On October 16, 2002, Donovan filed a timely Notice of Appeal.

We heard oral argument in this case on May 14, 2003. On June 4, 2003, this court requested Letter Briefs from each party on the issue of mootness. Donovan graduated from PAHS on June 6, 2003.

## C.

The United States District Court for the Western District of Pennsylvania had jurisdiction of the underlying action pursuant to 28 U.S.C. § 1331 based on Donovan's claims under the First Amendment, Fourteenth Amendment, 42 U.S.C. § 1983 and the Equal Access Act, 20 U.S.C. § 4071 *et seq.* Moreover, the court also had jurisdiction pursuant to 28 U.S.C. § 1343 of Appellant's civil rights claims. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

At the outset, we must address whether Appellant's request for injunctive and declaratory relief has become moot because she no longer attends PAHS. Although the parties did not raise the issue in their original briefs, we resolve the issue *sua sponte* because it implicates our jurisdiction. *See Rogin v. Bensalem Township*, 616 F.2d 680, 684 (3d Cir. 1980) ("Inasmuch as mootness would divest us of jurisdiction to consider this appeal, we are obligated to address this issue as a threshold matter.") (footnote omitted).

## A.

The Constitution limits this court's jurisdiction to the adjudication of actual cases and controversies. U.S. CONST. art. III, § 2; *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (per curiam). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). The court's ability to grant effective relief lies at the heart of the mootness doctrine. *County of Morris v. Nationalist Mvmt.*, 273 F.3d 527, 533 (3d Cir. 2001). That

is, "[i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698-699 (3d Cir. 1996). This requirement that a case or controversy be "actual [and] ongoing" extends throughout all stages of federal judicial proceedings, including appellate review. *Khodara Envtl., Inc. v. Beckman*, 237 F.3d 186, 193 (3d. Cir. 2001). If a case has become moot after the district court's entry of judgment, an appellate court no longer has jurisdiction to entertain the appeal. *Mills v. Green*, 159 U.S. 651, 653 (1895).

"The availability of declaratory [and injunctive] relief depends on whether there is a live dispute between the parties." *Powell v. McCormack*, 395 U.S. 486, 517-518 (1969) (citation omitted); *Jersey Cent. Power & Light Co. v. New Jersey*, 772 F.2d 35, 40 (3d Cir. 1985) ("A declaratory judgment is available only so long as there is an actual controversy [between] the parties."). When a student challenges the constitutionality of a school policy, graduation typically moots her claim for injunctive or declaratory relief. *See, e.g., Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (per curiam) ("[Once] all of the named plaintiffs in the action [have] graduated . . . a case or controversy no longer exists."); *Mellen v. Bunting*, 327 F.3d 355, 364 (4th Cir. 2003) ("[Students'] claims for declaratory and injunctive relief generally become moot when they graduate."); *Stotts v. Cmty. Sch. Dist. No. 1*, 230 F.3d 989, 991 (7th Cir. 2000) (holding that the "case lacks a live controversy [because the plaintiff] has graduated"); *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000), *cert. denied*, 532 U.S. 905 (2001) ("It is well-settled that once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy."); *Penderson v. La. State Univ.*, 213 F.3d 858, 874-875 (5th Cir. 2000) (finding injunctive claims mooted by student's graduation).

## B.

We have held, however, that graduation from school does not automatically render a case moot if the student's claims

are "capable of repetition, yet evading review." *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1113-1115 (3d Cir. 1992). This extremely narrow exception to the mootness doctrine is applicable only where: 1) the challenged action is too short in duration to be fully litigated before the case will become moot; and 2) there is a reasonable expectation that the complaining party will be subjected to the same action again. *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam).

We begin with the first prong of the test. Although we quite reasonably concluded in *Brody* that the challenge to religious speech in a graduation ceremony by students who had not yet graduated was not moot because the length of the senior year was "clearly too short to complete litigation and appellate review of a case of this complexity," *Brody*, 957 F.2d at 1113 (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 186 n.9 (1982)), the exception cannot rescue Donovan's appeal from the perils of mootness. A case challenging PAHS's ban of the Bible club from the activity period will not always evade review. A PAHS sophomore, for example, who challenges the ban would enjoy a three-year window in which to litigate the issue to completion. Donovan graduated on June 6, 2003, and she no longer has a reasonable expectation of being subjected to the policy.

As to the second prong, there is no reasonable expectation that Donovan will be subjected to the same action again.[2] She has graduated and will never again return to PAHS as a student. This court may not grant her injunctive relief, as such relief would have no impact on her whatsoever.

---

2. We do note that parents independently have standing to bring constitutional challenges to the conditions in their children's schools. *Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203, 224 n.9 (1963); *Brody*, 957 F.2d at 1114. If Donovan's parents had another child in the PAHS system and would "confront the same barriers to religious speech when their children" reach high school, we could potentially find that the present dispute was capable of repetition as to them. *Brody*, 957 F.2d at 1114. *See also Honig v. Doe*, 484 U.S. 305, 320-322 (1988). Donovan's counsel, nonetheless, has provided no information in this regard, and we do not entertain the argument here.

Accordingly, Donovan's claim for declaratory and injunctive relief is moot.[3]

## III.

When a specific claim becomes moot after the entry of a district court's final judgment and prior to the completion of appellate review, we have the power to vacate the district court's judgment as to that claim. *United States v. Munsingwear*, 340 U.S. 36, 39 (1950); *Bagby v. Beal*, 606 F.2d 411, 414 (3d Cir. 1979). The *Munsingwear* rule is an equitable one that is "commonly used . . . to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences." *Munsingwear*, 340 U.S. at 41. Vacatur of the lower court's judgment "is warranted only where mootness has occurred through happenstance — circumstances not attributable to the parties." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 71 (1997); *Jersey Cent. Power & Light v. New Jersey*, 772 F.2d 25, 26-27 (3d Cir. 1985). "*Munsingwear* should not be applied blindly, but only after a consideration of the equities and the underlying reasons for mootness." *Humphreys v. Drug Enforcement Admin.*, 105 F.3d 112, 113-114 (3d Cir. 1996). Accordingly, neither "mootness by reason of settlement," *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29 (1994), nor mootness due to the voluntary act of the losing party, *Karcher v. May*, 484 U.S. 72, 82-83 (1987), justifies vacatur of a judgment under review.

Because Donovan's claims for declaratory and injunctive relief became moot through happenstance, and for the reasons that follow, we exercise our power to vacate the

---

3. Although Donovan's counsel has stated that he intends to add a party pursuant to Federal Rule of Civil Procedure 21, we will not rule on the propriety of substituting a party via that method. In the absence of a motion to add, any ruling by this court on the issue would constitute nothing but an advisory opinion, contravening the Constitution's limitation of federal jurisdiction to actual cases and controversies. *See Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1153 (3d Cir. 1995) (quoting *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 410 (3d Cir. 1992)) ("[Article III, section 2 of the Constitution] 'stands as a direct prohibition on the issuance of advisory opinions.' ").

district court's judgment to the extent that it denied such relief.

## IV.

Although Donovan's claim for declaratory and injunctive relief is moot, her damages and attorney's fees claims continue to present a live controversy. *Boag v. MacDougall*, 454 U.S. 364 (1982) (holding that the transfer to another prison did not moot a claim for damages arising from placement in solitary confinement); *Jersey Cent. Power & Light Co. v. New Jersey*, 772 F.2d 35, 41 (3d Cir. 1985) ("[T]he availability of damages or other monetary relief almost always avoids mootness. . . . Damages should be denied on the merits, not on the grounds of mootness."). We shall therefore review the district court's determination, bound up in its October 10, 2002 final order, that Donovan is not entitled to money damages and attorney's fees.

### A.

Where . . . the facts are not in dispute and the parties challenge the choice, interpretation, and application of legal precepts, our review is plenary." *Gregoire v. Centennial Sch. Dist.*, 907 F.3d 1366, 1370 (3d Cir. 1990).

### B.

More than 20 years ago in *Widmar v. Vincent*, 454 U.S. 263 (1981), the Supreme Court held that a state college that sponsored a limited public forum violated the First Amendment when the college denied a religious student organization equal access to its facilities. As a corollary, the Court also held that permitting equal access would not contravene the First Amendment's Establishment Clause. *Id.* at 276-277.

Although the Court squarely addressed the parameters of the limited public forum in the public university context, it left unresolved the question of whether the case's holding extended to public secondary schools. Indeed, the Court distinguished younger students from their

"less impressionable" college counterparts, who should understand that a policy of equal access for religious groups does not imply impermissible state endorsement of religion. *Id.* at 274 & n.14; *Pope v. E. Brunswick Bd. of Educ.*, 12 F.3d 1244, 1245 (3d Cir. 1993).

It was against this backdrop that we decided *Bender v. Williamsport Area Sch. Dist.*, 741 F.2d 538 (3d Cir. 1984), *vacated on other grounds*, 475 U.S. 534 (1986) — a case in which we held that equal access for religious groups in public secondary schools violated the Establishment Clause by focusing on the differences between high school and college environments.[4] Although we took account of the time-tested axioms that students do not shed their rights to freedom of speech at the schoolhouse gate, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), and that "religious worship and discussion . . . are forms of speech and association protected by the First Amendment," *Widmar*, 454 U.S. at 269, we began by only tentatively concluding that the secondary school had created a limited public forum when it excluded a student prayer group from meeting during a regularly scheduled student activity period nearly identical to the one at PAHS. *Bender*, 741 F.2d at 548. In subsequently applying the second prong of the talismanic *Lemon v. Kurtzmann* test to determine whether permitting the group to meet would have the effect of advancing or inhibiting religion (and thus would violate the First Amendment's Establishment Clause), we noted that "high school students stand in a very different position than university students in terms of maturity and impressionability[, as they] would be less able to appreciate

4. The Supreme Court ultimately vacated *Bender* on the ground that the respondent — an individual member of the School Board — lacked standing to appeal from a declaratory judgment against the School Board itself. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 549 (1986), *vacating on other grounds*, *Bender v. Williamsport Area Sch. Dist.*, 741 F.2d 538 (3d Cir. 1984). Accordingly, the Court did not treat the First Amendment issues that we discussed.

In vacating our opinion, the Supreme Court stripped *Bender* of any force of law, and we are not controlled by it in any way, shape, or form. But because the district court leaned so heavily on our lifeless *Bender* holding to reach its conclusion, we shall address its content here.

the fact that permission for [the prayer group] to meet would be granted out of a spirit of neutrality toward religion and not advancement." *Id.* at 552. In light of this maturity difference and the additional fact that state law mandates compulsory attendance, we held that permitting the prayer group to meet would contravene the Establishment Clause because "the danger of communicating . . . state approval of religion" would outweigh free speech concerns. *Id.* at 555.

## C.

Congress, however, spoke very loudly in the days following *Bender* by enacting the Equal Access Act in 1984 to answer the very question left open by the majority in *Widmar* — namely, whether permitting equal access to religious groups in the public secondary school setting would violate the Establishment Clause. Equal Access Act, Pub. L. 98-3771, 98 Stat. 1302 (codified at 20 U.S.C. §§ 4071-4074). Congress believed that it would not.

With the EAA, Congress specifically made it "unlawful for any public secondary school which receives federal financial assistance and which has a limited open forum to deny equal access" to student groups based on the religious or other content-based nature of the speech at their proposed meetings. 20 U.S.C. § 4071(a). Congress passed the statute to address perceived widespread discrimination against religious speech in public schools. H.R. REP. NO. 98-710, at 4 (1984); S. REP. NO. 98-357, at 10-11 (1984). In particular, committee reports show that the EAA was enacted partly in response to two federal appellate court decisions holding that student religious groups could not, consistent with the Establishment Clause, meet on school premises during noninstructional time. H.R. REP. NO. 98-710, at 3-6 (discussing *Lubbock Civil Liberties Union v. Lubbock Indep. Sch. Dist.*, 669 F.2d 1038, 1042 (5th Cir. 1982), *cert. denied*, 459 U.S. 1155-1156 (1983), and *Brandon v. Guilderland Bd. of Educ.*, 635 F.2d 971 (2d Cir. 1980), *cert. denied*, 454 U.S. 1123 (1981)); S. REP. NO. 98-357, at 6-9 (1984) (same).

Although not mentioned by members of the House or Senate, *Bender* is precisely the sort of decision that

motivated Congress to pass the EAA. The District Court saw *Bender* as controlling, but we disagree, for important congressional activity and judicial interpretations of that activity took place after we issued that decision. *Bender* came down on July 24, 1984; the EAA went into effect on August 11, 1984. In *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, the Supreme Court held that the EAA did not, at least on the facts presented there, contravene the Establishment Clause. 496 U.S. 226, 253 (1990). And for the reasons set forth therein, we conclude that the same determination is mandated under the facts in the case at bar.

There is no doubt that the EAA and its jurisprudential progeny control our interpretation of the case before us today. *See Mergens*, 496 U.S. at 239 (relating the legislative purposes behind the EAA); *Pope*, 12 F.3d at 1245 (noting the transition from *Bender* to the EAA and applying the EAA in an equal access scenario). Moreover, the Supreme Court vacated *Bender* — albeit on different grounds — in 1986, rendering completely hollow the case on which the district court pinned its discussion. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 549 (1986), *vacating on other grounds*, *Bender v. Williamsport Area Sch. Dist.*, 741 F.2d 538 (3d Cir. 1984).

It is now opportune to discuss the EAA and the experience of the judiciary in interpreting it.

## V.

The EAA provides that it is "unlawful for any public secondary school which receives federal financial assistance and which has a limited open forum to deny equal access . . . to . . . any students who wish to conduct a meeting within that limited open forum on the basis of the religious . . . content of the speech at such meetings." 20 U.S.C. § 4071(a). Different from the "term of art" of the "limited public forum" established by the Supreme Court in its free speech cases, *Mergens*, 496 U.S. at 242, Congress determined that a "limited open forum" is created "whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to

meet on school premises during noninstructional time." 20 U.S.C. § 4071(b). "Meeting" is defined to include "those activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." 20 U.S.C. § 4072(3). "Noninstructional time" is defined to mean "time set aside by the school before actual classroom instruction begins or after actual classroom instruction ends." 20 U.S.C. § 4072(4). "Thus, even if a public secondary school allows only one 'noncurriculum related student group' to meet, the Act's obligations are triggered and the school may not deny other clubs, on the basis of the content of their speech, equal access to meet on school premises during noninstructional time." *Mergens*, 496 U.S. at 236.

In *Mergens*, the Supreme Court defined the term "noncurriculum related student group" as "one that has more than just a tangential or attenuated relationship to courses offered by the school. . . . It follows, then that a student group that is 'curriculum related' must have a more direct relationship to the curriculum than a religious or political club would have." 496 U.S. at 238. The Court then remarked that "the term 'noncurriculum related student group' is best interpreted broadly to mean any student group that does not directly relate to the body of courses offered by the school." *Id.* at 239.

Three years after *Mergens*, we distilled the Supreme Court's description into a four-part test for determining when a student group directly relates to the school curriculum:

> 1. The group's subject matter is (or soon will be) taught in a regularly offered course;
>
> 2. The group's subject matter concerns the body of courses as a whole;
>
> 3. Participation in the group is required in a particular course; or
>
> 4. Academic credit is given for participation in the group.

*Pope v. E. Brunswick Bd. of Educ.*, 12 F.3d 1244, 1251 (3d Cir. 1990). Explicating this test, we emphasized that "the

subject matter of the student group must be taught in a class. Thus, a chess club does not become curriculum-related merely because its subject matter relates to mathematics and science by building the ability to engage in critical thought processes; unless chess is actually taught, the club is a noncurriculum related student group." *Id.* at 1253.

Applying its own test, the Supreme Court deemed a scuba diving club (the Subsurfers) and the Peer Advocates — a service group that worked with special education classes — "noncurriculum related groups" because they did "not directly relate to the curriculum as a whole" or "to any courses offered by the school and [were] not required by any courses offered by the school." *Mergens*, 496 U.S. at 245-246. In *Pope*, we placed the Key Club — a community service group that "assists and enhances the students in developing their civic responsibilities to the community" — into the category of "noncurriculum related student groups." *Pope*, 12 F.3d at 1252. Notwithstanding the Board of Education's characterization of the Key Club as a "service organization [that] draw[s] upon all curricula areas," we embraced the Supreme Court's position in *Mergens* that "school systems [may not] evade the Act's requirements 'by strategically describing existing student groups.'" *Id.* at 1253 (quoting *Mergens*, 496 U.S. at 244).

The case before us presents no such complex problem on this front. PAHS allows a ski club and an anti-drug and -alcohol club (Students Against Destructive Decisions), among others, to meet during the school's activity period. These clubs are even less tangentially related to the curriculum than was the Key Club in *Pope*. Accordingly, the door to the limited open forum designation is ajar, but not yet wide open.

## VI.

The issue then comes whether the activity period during which at least one "noncurriculum related group" meets constitutes "noninstructional time" under the EAA. The EAA defines "noninstructional time" as "time set aside by the school before actual classroom instruction begins or

after actual classroom instruction ends." 20 U.S.C. § 4072(4).

Because neither this court nor the Supreme Court has yet to expound on the meanings of "noninstructional time" or "actual classroom instruction," we begin with the "plain meaning of [the] statute." *United States v. Hodge*, 321 F.3d 429, 436 (3d Cir. 2003); *see also Smith v. Fid. Consumer Disc. Co.*, 898 F.2d 907, 909 (3d Cir. 1990) ("The starting point for interpreting a statute is the language of the statute itself."). Where the intent of Congress "has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570 (1982). "Recourse to the legislative history . . . is unnecessary in light of the plain meaning of the statutory text." *Zubi v. AT&T Corp.*, 219 F.3d 220, 231 (3d Cir. 2000) (quoting *Darby v. Cisneros*, 509 U.S. 137, 147 (1993)).

The plain meaning of "noninstructional time," as defined in § 4072(4), is time set aside by the school before actual classroom instruction begins or after actual classroom instruction ends. The very phrases "noninstructional time" and "actual classroom instruction" demonstrate that there may very well be times in the school day during which students would not be receiving "actual classroom instruction."

Under this reading that is both plain and coherent, the PAHS activity period falls into the category of "noninstructional time." At PAHS, actual classroom instruction for *all* students does not begin until after the conclusion of the activity period at 8:54 a.m. During the activity period, at least one noncurriculum related group meets. Other students may take make-up tests or attend tutoring programs and college test prep clinics — two activities more closely related to actual classroom instruction.

That some students, however, may seek to engage in classroom instruction during the activity period does not render the *entire* period "instructional time" — much as having a carton of spoiled milk in the refrigerator does not mean that the apples, tomatoes and butter are rotten and

rancid too. Simply because the period may fall within the more general parameters of the school day does not indicate that all time within those parameters necessarily constitutes actual classroom instruction.

### A.

Nevertheless, the district court's reasoning appeared to mirror that of a particular case from the Court of Appeals for the Ninth Circuit, *Prince v. Jacoby*, 303 F.3d 1074, 1088 (9th Cir. 2002) — a decision that stands for the proposition that mere mandatory attendance marks the beginning of actual classroom instruction. After citing *Ceniceros v. Bd. of Trustees of the San Diego Unified Sch. Dist.*, 106 F.3d 878, 880 (9th Cir. 1996) for the proposition that "[w]e have already held that the plain meaning of "noninstructional time" is defined unambiguously in the statute as the "time set aside by the school before actual classroom instruction begins or after classroom instruction ends," the *Prince* panel picked apart the plain and coherent meaning of "actual classroom instruction." *Id.* Looking to legislative history, the panel reasoned that mandatory attendance combined with the availability of some classroom instruction gave rise to "actual classroom instruction" and thus transformed the student/staff time into "instructional time." *Id.* Accordingly, it concluded that Spanaway Lake High School's "student/staff time" did not qualify as "noninstructional time" because Spanaway Lake's students — unlike the *Ceniceros* students — were required to be in attendance during the period. *Id.* The district court, too, hung its hat on this "mandatory attendance" rationale. *Donovan v. Punxsutawney Area Sch. Bd.*, No. 02-205, at 6 (W.D. Pa. Oct. 10, 2002).

But in a court as large as the Ninth Circuit, where the full court does not have the advantage of studying every panel's proposed opinion prior to publication as we do here, it is not a rare event for one panel to overlook the reasoning of a previous panel on the same subject. Even though the *Prince* panel set forth an isolated quotation from the court's previous opinion in *Ceniceros*, its reasoning and decision seem to fly squarely in the face of what should have been

considered binding precedent in that court. It is to *Ceniceros* that we now turn.

## B.

Focusing on the temporal aspect of the EAA, the Ninth Circuit in *Ceniceros* held that a lunch period in the heart of the school day — during which several noncurriculum related student groups met and during which no "actual classroom instruction" was offered — qualified as "noninstructional time" because it was "time set aside by the school before actual classroom instruction begins or after classroom instruction ends." *Ceniceros*, 106 F.3d at 880. It reasoned that a direct reading of the EAA dovetails perfectly with the purpose of the legislation and with the *Mergens* Court's principles for construing it. *Id.* at 881. Recalling that the Supreme Court repeatedly noted that the EAA "must be given a 'broad reading' [to fulfill the EAA's broad purpose]," the *Ceniceros* panel concluded that "[o]nly by interpreting 'noninstructional time' to include lunch periods can we adhere to the Supreme Court's instruction and have our interpretation be 'consistent with Congress' intent to provide a low threshold for triggering the Act's requirements." *Id.* (quoting *Mergens*, 496 U.S. at 239, 240).

To be sure, decisions of a sister court of appeals never have the strong bite of precedent in this court. Jurisprudentially speaking, they are considered persuasive argument only, and we are free to accept or reject any of their decisions. We accept *Ceniceros* and reject *Prince* because we believe that these two cases cannot be reconciled. We are persuaded that the *Ceniceros* panel followed precisely the same analytical roadmap that we followed in interpreting "noninstructional time." We are similarly persuaded that the *Prince* panel ignored both the teachings of *Ceniceros* and the definition of "noninstructional time" set forth in the EAA.

As stated before, the EAA defines "noninstructional time" as "time set aside by the school before actual classroom instruction begins or after actual classroom instruction ends." 20 U.S.C. § 4072(4). The *Prince* panel conceded that "student/staff time [at Spanaway High] is a scheduled class

where attendance is taken, and *where no formal classroom instruction takes place*, except on a voluntary, individual basis. During this time, a student may work on homework, receive one-on-one tutoring with a teacher, attend school assemblies, or, with prior arrangement and scheduling, participate in a student club meeting. Students are not permitted to leave campus, and attendance is taken." 303 F.3d at 1087 (emphasis added). Having conceded that "no formal classroom instruction takes place," the *Prince* panel should have followed the mandatory logical rules of the categorical deductive syllogism to conclude that the activity period fell before or after "actual classroom instruction," thus qualifying under the statute. The student/staff time in *Prince* fell in the middle of the instructional school day, sandwiched between definite periods of "actual classroom instruction" — a temporal framework identical to the lunchtime scenario in *Ceniceros*.

### C.

To conclude that mandatory attendance means that any school period is actual classroom instruction is to undercut both the specific the language and the statutory purpose of the EAA. In *Mergens*, a Supreme Court plurality found this time limitation significant because it cleverly avoids the problem of mandatory attendance requirements during religion-oriented sessions, which the Court had previously struck down. *Mergens*, 496 U.S. at 251 (citing *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) — a case invalidating a state law requiring the teaching of creationism to students during science classes for which attendance was mandatory). *See also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-310 (2001) (equating a policy of mandatory prayer before public school football games with school sponsorship of religion and noting that some students *must* attend the games due to seasonal commitments).

Although PAHS students must stay at the school during the activity period, they need not attend the FISH Bible club's meeting — or any meeting, for that matter. It is not mandatory attendance at the school, but mandatory attendance *at the group's meeting* that raises Establishment Clause concerns.

In drafting the EAA, Congress could have said "before or after the school day" or "before or after classes," but it did not. Instead, it used the concept of "actual classroom instruction," which we take to mean classroom instruction in discrete areas.

It is beyond dispute that the PAHS activity period kicks off "before actual classroom instruction begins," as it comes after a homeroom period during which no classroom instruction occurs. Once again, just as "schools may not evade the Act's requirements 'by strategically describing existing student groups,'" *Pope*, 12 F.3d at 1253 (quoting *Mergens*, 496 U.S. at 244), they may not do so by strategically describing an activity period. Just as putting a "Horse" sign around a cow's neck does not make a bovine equine, a school's decision that a free-wheeling activity period constitutes actual classroom instructional time does not make it so.

### D.

The district court was also ill-advised to rely on the circumstance that the school district and the state school board count the "activity period" toward the state's minimum number of hours of "instruction time" as a rationale for neglecting to classify the activity period as "noninstructional time."[5] *Donovan v. Punxsutawney Area Sch. Bd.*, No. 02-205, at 6 (W.D. Pa. Oct. 10, 2002). Contrary to the District Court's implication, we conclude that the state's interpretation of the broad phrase

---

5. The Punxsutawney Area School District counts the activity period as "instructional time" for purposes of complying with Pennsylvania's minimum length of an instructional school day. 22 PA. CODE § 51.61 (2002). Pennsylvania law permits schools to count activity other than "actual classroom instruction" in calculating the length of the school's instructional day. Under Pennsylvania law, "instruction time" is defined as "the time during the school day which is devoted to instruction and activities provided as an integral part of the school program under the direction of certified school employees." *Id.* State school board guidelines include "[a]ssemblies, clubs, student councils, and similar activities conducted during school hours" as among those activities which may be counted as pupil instruction time. Basic Education Circulars, Instruction Time and Act 80 Exceptions, 24 P.S. § 15-1504 (July 1, 2001).

"instructional time" by definition is much more inclusive than the EAA's restrictive measurement of "actual classroom instruction."; therefore, it is not controlling. The Supremacy Clause establishes that, for the purposes of EAA application, state law cannot be used to frustrate application of federal law. U.S. CONST. art. VI, § 1, cl. 2.

Once again, in *Mergens*, the Supreme Court stated that allowing school systems to define terms in a way that "permits schools to evade the Act . . . would render the Act merely hortatory." 496 U.S. at 244. School systems cannot be permitted to evade application of the EAA by stating that a period that is otherwise a "limited open forum" does not constitute "noninstructional time" under the EAA simply because the school system chooses to count that time toward the state minimum number of hours of instruction time.

## VII.

Having concluded that PAHS violated the EAA, we now turn to Donovan's First Amendment claim under 42 U.S.C. § 1983. The district court concluded that the PAHS activity period was a limited public forum for which the Bible club restriction was narrowly tailored to serve a compelling state interest — namely, avoiding a possible transgression of the First Amendment's Establishment Clause. *Donovan v. Punxsutawney Area Sch. Bd.*, No. 02-205, at 7-8 (W.D. Pa. Oct. 10, 2002). We disagree.

## A.

In evaluating the claim that Donovan's First Amendment rights have been violated, we have a "constitutional duty to conduct an independent evaluation of the record as a whole, without deference to the trial court." *Christ's Bride Ministries v. SEPTA*, 148 F.3d 242, 247 (3d Cir. 1998) (citation omitted).

## B.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right

of the people to peacefully assemble." U.S. CONST. amend I. Religious worship and discussion "are forms of speech and association protected by the First Amendment." *Widmar v. Vincent*, 454 U.S. 263, 269 (1981).

Generally, the government may limit speech that takes place on its own property without running afoul of the First Amendment. *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 580 U.S. 384, 390 (1993); *Christ's Bride*, 148 F.3d at 247. Where, however, the property at issue is a traditional public forum or a forum designed as public by the government, the First Amendment hinders the government's ability to restrict speech. *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45-46 (1983); *Christ's Bride*, 148 F.3d at 247. A limited public forum — a subcategory of the designated public forum — "is created when the government opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain kinds of subjects." *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1246-1247 (3d Cir. 1992) (citation omitted). Donovan and Appellees agree that the PAHS activity period is a limited public forum, and we will treat the period as such.

Although the government may indeed restrict the limited public forum to certain subjects and certain speakers, the government "may not discriminate against speech on the basis of viewpoint, and the restriction must be reasonable in light of the purpose served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-107 (2001). With regard to viewpoint restrictions, "speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." *Id.* at 112; *see also Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) (holding that a university engaged in improper viewpoint discrimination when it denied student activities funds to a student magazine addressing public policy issues from a Christian perspective); *Lamb's Chapel v. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) (holding that a school's refusal to permit an organization access to school facilities at night to show a film about family issues from a religious perspective constituted impermissible viewpoint discrimination).

FISH is a group that discusses current issues from a biblical perspective, and school officials denied the club equal access to meet on school premises during the activity period solely because of the club's religious nature.

Accordingly, we hold that the exclusion constitutes viewpoint discrimination. "Because the restriction is viewpoint discriminatory, we need not decide whether it is unreasonable in light of the purposes served by the forum." *Good News Club*, 533 U.S. at 107.

## C.

The district court concluded that PAHS's "interest in protecting free speech within the context of the activity period as it exists at . . . PAHS is most likely outweighed by" an Establishment Clause violation, if the Bible group were permitted to meet. *Donovan v. Punxsutawney Area Sch. Bd.*, No. 02-205, at 10 (W.D. Pa. Oct. 10, 2002). We disagree.

### 1.

Although government interest in avoiding an Establishment Clause violation may be characterized as compelling and thus justify content-based discrimination, *Widmar v. Vincent*, 454 U.S. 263, 271 (1981), it is "not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination." *Good News Club*, 533 U.S. at 113. We need not confront this thorny issue in this case because the school has no valid Establishment Clause interest.

The Supreme Court has repeatedly rejected Establishment Clause defenses in free speech cases. *See, e.g., Good News Club*, 533 U.S. at 113; *Lamb's Chapel*, 508 U.S. at 395; *Widmar*, 454 U.S. at 272-273. To determine whether such a defense is viable, we first consider an action's " 'neutrality toward religion.' " *Good News Club*, 533 U.S. at 114 (quoting *Rosenberger*, 515 U.S. at 839). Appellees do not take issue with this aspect of the inquiry and implicitly agree that "allowing the Club to speak on school grounds would ensure neutrality, not threaten it." *Good News Club*, 533 U.S. at 114.

**2.**

Donovan and Appellees come to blows, however, over whether "a meeting of a religious group during the activity period which occurs during instructional hours where attendance is compulsory, when conducted in the constant presence of school[-]appointed monitors, carries with it the impression of official approval and endorsement [of religion]." *Donovan v. Punxsutawney Area Sch. Bd.*, No. 02-205, at 9 (W.D. Pa. Oct. 10, 2002). The district court believed that it did, but we find the argument unpersuasive.

In *Good News Club*, the Supreme Court leaned heavily on the fact that after-school meetings by the religious club at issue in that case "would not implicate activity by the school during the school day" to resolve that students would not perceive that the government had endorsed religion by permitting the group to meet. 533 U.S. at 115 & n.7. Searching valiantly for a potential loophole, Appellees seize on *Illinois ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71, Champaign City*, 333 U.S. 203 (1948), for the proposition that the availability of religious discussion during a time of compulsory attendance unconstitutionally advances religion. In *McCollum*, the school district excused students from their normal classroom study during the regular schoolday to attend classes taught by sectarian religious teachers, who were subject to approval by the school superintendent. *Id.* at 209. Under these circumstances, this Court found it relevant that "the operation of the State's compulsory education system . . . assisted and was integrated with the program of religious instruction carried on by separate religious sects." *Id.*

In the present case, in contrast, PAHS simply permits students to participate in a broad range of student activities during noninstructional time, and Donovan merely seeks an equal opportunity to express herself along with other like-minded students. The varied options available to PAHS students, the voluntariness of student participation, and the fact that any religious speech engaged in would be initiated by students themselves militate against any government endorsement of or

entanglement with religion if FISH were to have been able to meet during the activity period.

With regard to whether the presence of school monitors at a Bible club meeting would carry with it the imprimatur of a government's endorsement of religion, we note that the Equal Access Act prohibits monitors from participating in religious meetings, as well as school sponsorship of those meetings. 20 U.S.C. §§ 4071(c)(2)-4071(c)(5). "[C]ustodial oversight of the student-initiated religious group, merely to ensure order and good behavior, does not impermissibly entangle government in the day-to-day surveillance or administration of religious activities." *Mergens*, 496 U.S. at 253 (citing *Tony and Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290, 305-306 (1985)).

Accordingly, we conclude that permitting FISH to meet during the PAHS activity period would not have violated the Establishment Clause.

\* \* \* \* \*

We hold that the PAHS activity period constitutes "noninstructional time" under the EAA. PAHS triggered the creation of a limited open forum and the application of the EAA when it allowed noncurriculum related groups to meet before actual classroom instruction began. Moreover, when PAHS denied the Bible club access to the school's limited public forum on the ground that the Club was religious in nature, it discriminated against the club because of its religious viewpoint in violation of the Free Speech Clause of the First Amendment. Because PAHS has not raised a valid Establishment Clause claim, we do not address the question whether such a claim could excuse PAHS's viewpoint discrimination.

We reverse the district court's order dismissing all claims and remand for determination of damages and attorney's fees with a direction that the portion dealing with injunctive and declaratory relief be vacated under the teachings of *United States v. Munsingwear*, 340 U.S. 36, 39 (1950).

We have considered all contentions presented by the parties and conclude that no further discussion is necessary.

We will VACATE that portion of the District Court's judgment dealing with declaratory and injunctive relief and REVERSE and REMAND the portion dealing with money damages and the possibility of attorney's fees for further proceedings.

A True Copy:
        Teste:

                *Clerk of the United States Court of Appeals*
                        *for the Third Circuit*