# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 06-1999, 06-2573

MICHAEL D. BRANDT, on behalf of himself
  and all others similarly situated,

*Plaintiffs-Appellants*,

v.

BOARD OF EDUCATION OF CITY OF CHICAGO, et al.,

*Defendants-Appellees*.

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 0904—**Amy J. St. Eve**, *Judge*.

_____

ARGUED JANUARY 4, 2007—DECIDED FEBRUARY 20, 2007

_____

Before POSNER, RIPPLE, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*.  This class action suit was brought on behalf of 24 eighth graders at a Chicago public school called the Beaubien Elementary School. They were disciplined for conducting a protest that they claim is privileged by the free-speech clause of the First Amendment, held applicable to state action by the Fourteenth Amendment. The suit was dismissed on the defendants' motion for summary judgment, so we state the facts as favorably to the plaintiffs as the record permits.

Every year the eighth graders choose a class T-shirt. Among the designs submitted for the 2003 contest was plaintiff Michael Brandt's; his mother is the plaintiffs' lead counsel. Brandt was in the school's program for gifted students. The program draws from all over Chicago. The other students in the school, the ones who are not in the gifted program, are local. There are some tensions between the "gifties," as the students in the gifted program call themselves, and the "tards," a derogatory term (short for "retards") sometimes applied by gifties to the other students. The gravity of those tensions is not revealed by the record.

The gifties had agreed to vote en bloc for Brandt's T-shirt design, and when it lost they smelled a rat, and submitted a protest to the principal. Some 30 designs in all had been submitted. There were 27 gifties and 72 other students in the eighth grade; and so if the 27 voted en bloc for one design and the votes of the 72 other students were scattered across the 29 other designs, the gifties' design would be almost certain to obtain a plurality of the votes. Yet when the ballots were counted, the teacher in charge of the contest announced that the vote was too close to call. She ordered a revote limited to three of the designs, one of them Brandt's; and with only two competing designs, the gifties' bloc-voting scheme failed. The teachers' practice, it turned out, was to conduct a revote among the top three contenders if the initial vote did not produce a winner with a majority, not merely a plurality, of the votes cast. The winning design unfortunately is not in the record, but apparently it was inoffensive, with an animal and a cap depicted on the front of the shirt and the names of all the eighth graders listed on the back.

The gifties were indignant. When the teacher refused to explain her runoff system or how the votes had been counted and what the tally had been, Brandt added the words "Gifties 2003" to the back of his T-shirt design; shirts incorporating the design were produced; and the gifties wore those shirts in school instead of the T-shirt that had won the contest. (A photocopy of the shirt is appended to this opinion.) They did this both to protest what they considered a rigged election and because they thought that Brandt's design represented the gifties better than the winning (and therefore the official) class T-shirt did.

In wearing the Brandt shirt, the gifties were acting in defiance of the principal of the Beaubien school, who having gotten wind of their plan had told them that wearing the shirt would show disrespect for him and create a risk to the good order of the school, presumably because it might offend the students who had voted for the winning T-shirt, although he did not make this point explicitly. An assistant principal warned that if they wore the shirt the gifties would be violating a provision (since changed) of the Chicago Public Schools' Uniform Discipline Code that prohibited students from wearing clothing with "inappropriate words or slogans," and would be punished.

Despite this warning, the gifties went ahead with their plan. But, craftily, they first wore the forbidden shirt on the day when city-wide tests were administered to public school students. They figured the school would not take disciplinary action against them on that day, lest that lower the school's average test scores (they are gifties, after all). But on each of nine subsequent days, the shirt was worn by at least one gifty, and each time all the gifties were punished by being confined to their home-

room, as a result missing gym, science lab, computer lab, and after-school activities. Eventually the school summoned a "Crisis Intervention Team" from the Board of Education, and it investigated and decided that the wearing of the Brandt T-shirt by the gifties was not a safety problem (that is, would not lead to violent altercations with the other eighth graders), so the gifties were permitted to resume wearing the shirt.

The plaintiffs seek both equitable relief and damages. Originally they sought an injunction against the "inappropriate words or slogans" rule and an order that the school expunge any record of the disciplinary action taken against the gifties. Not only were the gifties ultimately permitted to wear the Brandt T-shirt, but the rule has been changed; and so the plaintiffs have dropped their request for an injunction. In any event, they're all now in high school, having graduated from the eighth grade years ago; their quest to enjoin the rule is therefore moot. *Board of School Commissioners v. Jacobs*, 420 U.S. 128, 129 (1975) (per curiam); *DeFunis v. Odegaard*, 416 U.S. 312, 318-19 (1974) (per curiam); *Stotts v. Community Unit School District*, 230 F.3d 989, 991 (7th Cir. 2000). They could not invoke the exception, to the normal rule of mootness, for claims that are "capable of repetition, yet evading review," *Roe v. Wade*, 410 U.S. 113, 124-25 (1973), because it requires that the claim be repeatable by the same plaintiff. *Weinstein v. Bradford*, 423 U.S. 147, 148-49 (1975) (per curiam); *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam); *Majors v. Abell*, 317 F.3d 719, 722-23 (7th Cir. 2003); *Stotts v. Community Unit School District*, *supra*, 230 F.3d at 991; *Donovan v. Punxsutawney Area School Board*, 336 F.3d 211, 216-18 (3d Cir. 2003)—a condition rarely satisfied other than in abortion and election cases, though it could be satisfied in

a school case, see *Jones v. Illinois Dept. of Rehabilitation Services*, 689 F.2d 724, 727-28 (7th Cir. 1982), if for example the suit was over something that had happened at the end of one school year but could happen again at the end of the next year and the plaintiff would still be in school then. But the condition is impossible to satisfy in this case, as none of the plaintiffs will ever again be gifties or subject to the superseded clothing rule.

The school has retained no records of the discipline meted out to the gifties over the T-shirt incident, which would seem to moot the other equitable claim, the claim that the record of their discipline be expunged. But they are asking that the school authorities be forbidden to *tell* anyone that the gifties were punished for wearing the Brandt T-shirt. There is a touch or irony in the claim, since by filing this suit the plaintiffs have spread far and wide the information concerning their conduct and the school's response to it; the suit has attracted a fair amount of publicity. See www.google.com/search?hl=en&q=gifties+beaubien+brandt, visited Jan. 26, 2007. There is further irony in requesting in a suit based on freedom of speech an order curtailing the defendants' freedom of speech. Suppose the principal of Beaubien Elementary School decided to write a memoir in which he planned to discuss the T-shirt brouhaha—maybe it was the most exciting episode in his career as a school administrator. Should he be enjoined from doing that? He *could* be enjoined, as it is a myth that all injunctions against free speech are barred by the First Amendment as "prior restraints," see, e.g., *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 762-66 (1994); *Snepp v. United States*, 444 U.S. 507, 510 n. 3 (1980) (per curiam); *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 389-

90 (1973); *Near v. Minnesota*, 283 U.S. 697, 715-16 (1931); *United States v. Progressive, Inc.*, 467 F. Supp. 990 (W.D. Wis.), appeal dismissed, 610 F.2d 819 (7th Cir. 1979), but only if there was evidence that the defendants were likely to conduct a vendetta against the gifties—were trying to block their access to college or to good jobs by spreading the word that they had been punished for wearing an unofficial T-shirt. The plaintiffs do not claim to have any evidence of so improbable a plot.

Sufficient unto the day is the evil thereof. Any defendants who in a spirit of vengeance spread the word that the gifties were disciplined will be vulnerable, at least in principle, to a suit for defamation unless they make clear that the discipline that they imposed had been disapproved by the Board of Education's Crisis Intervention Team. Conceivably they would be vulnerable to being sued for committing other torts as well, such as depicting a person in a false light or interfering with his actual or prospective contracts, for example with a possible employer. Of course no college or employer would be likely to be much concerned with mild discipline meted out to an eighth grader. An air of unreality clings to every aspect of this litigation.

But we must trudge on, and consider the plaintiffs' damages claim. Even multiplied by 24 (the number of members of the plaintiff class), the damages sustained by an eighth grader as a consequence of missing phys ed and labs on nine days out of an entire school year are minuscule to the point of nonexistent; and *de minimis non curat lex* (the law doesn't concern itself with trifles) is a doctrine applicable to constitutional as to other cases. *Ingraham v. Wright*, 430 U.S. 651, 674 (1977); *United States v. Broomfield*, 417 F.3d 654, 656 (7th Cir. 2005); *Hessel v.*

*O'Hearn*, 977 F.2d 299, 303-04 (7th Cir. 1992); *Linwood v. Board of Education*, 463 F.2d 763, 767-68 (7th Cir. 1972). It is true that nominal damages can be awarded for a constitutional violation, *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978); *Calhoun v. DeTella*, 319 F.3d 936, 940-41 (7th Cir. 2003), as is sometimes true for other intentionally tortious conduct as well. E.g., *Ainsworth v. Century Supply Co.*, 693 N.E.2d 510, 514 (Ill. App. 1998); *Sanchez v. Clayton*, 877 P.2d 567, 573 (N.M. 1994). But such an award presupposes a violation of sufficient gravity to merit a judgment, even if significant damages cannot be proved; and this is not such a case. In any event there has been no constitutional violation.

The plaintiffs do not argue that the Brandt T-shirt is itself protected speech. They are right not to make such an argument. Although freedom of speech and of the press—the relevant terms in the First Amendment—are often loosely paraphrased as "freedom of expression," and clothes are certainly a way in which people express themselves, clothing as such is not—not normally at any rate—constitutionally protected expression. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 507-08 (1969); *Blau v. Fort Thomas Public School District*, 401 F.3d 381, 389 (6th Cir. 2005) (12-year-old "Amanda Blau's desire to wear clothes she 'feel[s] good in,' as opposed to her desire to express 'any particular message'" held not to be protected speech). Self-expression is not to be equated to the expression of ideas or opinions and thus to participation in the intellectual marketplace. Nor is the kind of "message" that clothing normally sends— "I am rich," "I am sexy," "I have good taste," and so forth—intended to contribute to competition in that marketplace.

Of course there can be speech printed on clothing, political symbols such as a swastika or a campaign button affixed to clothing, and masks and costumes that convey a political or other message. See, e.g., *Texas v. Johnson*, 491 U.S. 397, 404 (1989), and cases cited there. Merely wearing clothes inappropriate to a particular occasion could be a political statement. For that matter, parading in public wearing no clothing at all can, depending on the circumstances, convey a political message. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460-61 (4th Cir. 2005); *United States v. Various Articles of Merchandise*, 230 F.3d 649, 658-59 (3d Cir. 2000); *Huffman v. United States*, 470 F.2d 386, 399 (D.C. Cir. 1971). But the picture and the few words imprinted on the Brandt T-shirt are no more expressive of an idea or opinion that the First Amendment might be thought to protect than a young child's talentless infantile drawing which Brandt's design successfully mimics. Otherwise every T-shirt that was not all white with no design or words, with not even the manufacturer's logo or the owner's name tag, would be protected by the First Amendment, and schools could not impose dress codes or require uniforms without violating the free speech of the students, a proposition sensibly rejected in the *Blau* case.

The plaintiffs argue, however, that when worn as part of a protest against the election to choose the official class shirt, the Brandt T-shirt *became* protected expression. That is not a ridiculous argument. If Irish people were forbidden to wear green on St. Patrick's Day, a natural form of protest would be to wear green on that day. Cf. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 303-05 (1984). But the importance of context cuts both ways. The protesters in this case are school-

children. They are privileged schoolchildren in a school that contains a majority of nonprivileged children. They insist that unless their T-shirt is adopted by the entire eighth grade, they will as it were secede, and flaunt their own T-shirt. They do not recognize the principal's authority or the legitimacy of the school's procedures for determining the winner of contests.

We have our doubts whether the constitutional privilege to engage in protest demonstrations in the name of free speech extends to eighth graders. The plaintiffs' lawyer told us at argument that the clause extends at least as far down the maturity ladder as a 10-year-old (a proposition in profound tension with *Muller by Muller v. Jefferson Lighthouse School*, 98 F.3d 1530, 1538-39 (7th Cir. 1996), and *Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 736-38 (7th Cir. 1994), and cases cited there), and that the object of the protest is irrelevant. It could be, she acknowledged, a protest against the brand of ketchup served in the school cafeteria. She insists that the school's authority to prevent or punish such protests must be decided by a jury asked to strike the balance between free speech and school order. If she is right, then from now on public school policies and practices will be determined in this circuit by juries rather than by school authorities. Cf. *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

But we need not go so far as to deny that eighth graders have *any* First Amendment rights, for it is plain that the school did not violate the amendment by attempting, albeit with distinctly limited success because of the decision of the Crisis Intervention Team, to exclude the Brandt T-shirt from the school. We must be precise about the right that the plaintiffs sought to vindicate by protesting. It is the right to an explanation by the school for how the

election to pick an official eighth-grade T-shirt was conducted. We do not think eighth graders have such a right. For the school to hold an election for class T-shirt and rig the results, as the plaintiffs suspect happened, is probably not a recommended educational practice, but it is not an infringement of any legal right.

In any event, it was not the protest as such that was forbidden, but merely a particular means of protest. The gifties were free to protest in more conventional, less potentially disruptive, ways than by the wearing of the Brandt T-shirt. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 293 (2000) (plurality opinion); *One World One Family Now v. City & County of Honolulu*, 76 F.3d 1009, 1014 (9th Cir. 1996). They did so—they petitioned the principal and made a presentation to the Local School Council at the principal's urging and were not punished for doing so. Their parents amplified the gifties' voices of protest. With many routes of communication open to the gifties, the closing of the T-shirt route inflicted the most minimal of possible injuries, if injury at all (as we doubt), to the First Amendment.

Public schools have an interest of constitutional dignity in being allowed to manage their affairs and shape their destiny free of minute supervision by federal judges and juries. Academic freedom, "a special concern of the First Amendment." *Keyishian v. Board of Regents*, 385 U.S. 589, 602 (1967), is not just the freedom of teachers, school authorities, and to an extent students to express ideas and opinions. "It includes the authority of the university to manage an academic community and evaluate teaching and scholarship free from interference by other units of government, including the courts." *Hosty v. Carter*, 412 F.3d 731, 736 (7th Cir. 2005) (en banc); see also *Grutter v. Bol-*

*linger*, 539 U.S. 306, 328-30 (2003); *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985); *Piarowski v. Illinois Community College District 515*, 759 F.2d 625, 629-30 (7th Cir. 1985). Most of the cases that honor that interest involve colleges and universities, but their principle applies with equal if not greater force to lower schools as well, see, e.g., *Chicago Board of Education v. Substance, Inc.*, 354 F.3d 624, 630-31 (7th Cir. 2003), and implies that the principals of those schools have discretion to regulate students' conduct in order to maintain an atmosphere conducive to learning. E.g., *Vernonia School District 47J v. Acton*, 515 U.S. 646, 655-56 (1995); *Baxter by Baxter v. Vigo County School Corp., supra*, 26 F.3d at 737. Just weeks ago we held that an elementary-school teacher has no "constitutional right to introduce his own views on the subject but must stick to the prescribed curriculum—not only the prescribed subject matter, but also the prescribed perspective on that subject matter." *Mayer v. Monroe County Community School Corp.*, No. 06-1993, 2007 WL 162833, at *1 (7th Cir. Jan. 24, 2007). So if, contrary to what we said earlier, the Brandt T-shirt is "speech," still we must not ignore the Supreme Court's admonition that "a school need not tolerate student speech that is inconsistent with its 'basic educational mission.' " *Hazelwood School District v. Kuhlmeier, supra*, 484 U.S. at 266.

Prohibiting children from wearing to school clothing that contains "inappropriate" words or slogans places appropriately broad limits on the school authorities' exercise of discretion to maintain a proper atmosphere. Tighter limits, expressed in precise rules, would prevent them from responding to novel challenges well illustrated by the present case. Whatever the Crisis Intervention Team may have thought with the benefit of hindsight, the principal of

the Beaubien school had to decide *before* the T-shirt protest, and therefore with less information than the Crisis Information Team had, whether to permit the gifties to protest the election results by flouting the official T-shirt. After having reasonably decided not to permit such conduct, he had to decide whether to allow the gifties to defy his prohibition, and he again reasonably decided that the imposition of mild discipline was necessary in order to affirm his authority and maintain order.

He may, of course, have been wrong. But the existence of discretion implies a license to make mistakes. An exercise of official discretion is reversible by a court only when the official can be said to have abused his discretion, implying conduct not merely mistaken in retrospect but unreasonable. E.g., *Zhou v. Guardian Life Ins. Co.*, 295 F.3d 677, 679-80 (7th Cir. 2002); *Morton v. Smith*, 91 F.3d 867, 870 (7th Cir. 1996). The principal (himself an alumnus of the eighth grade at Beaubien Elementary School) did not abuse his discretion.

We do not accept all the arguments that the defendants press on us. They say that the Brandt T-shirt had to be banned because it ridicules students with disabilities—the right hand of the cartoon figure is deformed. It is more likely that Brandt simply can't draw very well. Nevertheless the principal would have been justified in banning the wearing of the shirt had he reasonably believed that it would be offensive to disabled children. But that was not his ground. The defendants also contend that there was a danger that the non-gifted children would be incensed by the gifties' refusal to accept the result of the election, and violence might result; there apparently had been a shoving incident between a "gifty" and a "tard" a week before the gifties started wearing the Brandt T-shirt.

But the evidence of tensions between the two groups of student was not developed, and so cannot be a ground for upholding the defendants' actions.

There is, however, ground enough, as we have explained. The T-shirt is not protected speech, and we are doubtful that it became so by being a vehicle for eighth graders to protest the outcome of a T-shirt contest. If protected at all, it was not immune from reasonable regulation by the school authorities.

The plaintiffs argue finally that the district judge should not have ordered them to pay the defendants' costs. There is no possible merit to the argument. They have made the defendants jump through a number of costly hoops in this protracted litigation and must bear the usual consequences of failed litigation.

AFFIRMED.



**EXHIBIT A**

The Design on front of t-shirt.

# "Gifties'

## 2003

**EXHIBIT B**
The Design on back of t-shirt.

*Appendix B-2*

A true Copy:
  Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*